# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

| | |
|---|---|
| NORTH JERSEY MEDIA GROUP INC., BLOOMBERG L.P., NBCUNIVERSAL MEDIA, LLC, THE NEW YORK TIMES COMPANY, NEW JERSEY ADVANCED MEDIA, DOW JONES & COMPANY, INC., THE ASSOCIATED PRESS, PUBLIC MEDIA NJ, INC., NEW YORK PUBLIC RADIO, AMERICAN BROADCASTING COMPANIES, INC., PHILADELPHIA MEDIA NETWORK, PBC, and POLITICO, | No. |

Movants/Appellees,

v.

UNITED STATES OF AMERICA, WILLIAM E. BARONI, JR., and BRIDGET ANNE KELLY,

Respondents,

THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY,

Intervenor,

JOHN DOE,

Intervenor/Appellant.

**EMERGENCY MOTION FOR STAY PENDING APPEAL**

Jenny Kramer
**CHADBOURNE & PARKE LLP**
1301 Avenue of the Americas
New York, NY  10019-6022
Phone: (212) 408-1054

*Counsel for Intervenor John Doe*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................... ii

PRELIMINARY STATEMENT .................................................................1

I.    THE COURT SHOULD ENTER AN EMERGENCY STAY
      PENDING APPEAL BECAUSE ABSENT A STAY, DOE WILL BE
      BRANDED A CRIMINAL WITHOUT DUE PROCESS............................2

      1.  Likelihood of Success on the Merits .........................................3

      2.  Irreparable Harm.....................................................................12

      3.  Balance of the Equities............................................................14

      4.  Public Interest .........................................................................15

CONCLUSION ....................................................................................16

# TABLE OF AUTHORITIES

## Cases

*Application of Jordan*,
    439 F. Supp. 199 (S.D.W.Va. 1977) ...................................................5, 13

*Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of HHS*,
    No. 13-1144, 2013 U.S. App. LEXIS 2706 (3d Cir. Feb. 8, 2013) ......................3

*Doe v. Hammond*,
    502 F. Supp. 2d 94 (D.D.C. 2007)............................................. 3, 6, 13

*Elrod v. Burns*,
    427 U.S. 347 (1976) ...................................................13

*Fitzgerald v. Mountain Laurel Racing, Inc.*,
    607 F.2d 589 (3d Cir. 1979) ...................................................13

*Hilton v. Braunskill*,
    481 U.S. 770 (1987) ...................................................2

*In re Cendant Corp.*,
    260 F.3d 183 (3d Cir. 2001) ...................................................9

*In re Smith*,
    656 F .2d 1101 (5th Cir. 1981)................................................. 3, 5, 6

*Martin v. Wilks*,
    490 U.S. 755 (1989) ...................................................14

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ...................................................13

*Pansy v. Borough of Stroudsburg*,
    23 F.3d 772 (3d Cir. 1994) ...................................................9, 10

*Pichler v. UNITE*,
    585 F.3d 741 (3d Cir. 2009) ...................................................9

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) ...................................................13

ii

*United States v. Anderson*,
  55 F. Supp. 2d 1163 (D. Kan. 1999) ......................................................... 3, 6, 10

*United States v. Briggs*,
  514 F.2d 794 (5th Cir. 1975) ...................................................................... passim

*United States v. Chadwick*,
  556 F.2d 450 (9th Cir. 1977) ...................................................................... 3, 5, 13

*United States v. Christian*,
  660 F.2d 892 (3d Cir. 1991) .................................................................................4

*United States. v. Smith*,
  776 F.2d 1104 (3d Cir. 1985) ........................................................... 8, 10, 11, 12

*Wisconsin v. Constantineau*,
  400 U.S. 433 (1971) ................................................................................ 5, 7, 13

## Rules

Fed. R. App. P. 8(a) ...............................................................................................2

Fed. R. Civ. P. 5(d)(2).............................................................................................9

Fed. R. Crim. P. 49(d).............................................................................................9

## Journals & Treatises

Charles Alan Wright et al., 11 *Fed. Prac. & Proc. Civ.* § 2904 (3d ed. 2015) .........2

Charles Alan Wright et al., 11A *Fed. Prac. & Proc.* § 2948.1 (2d ed. 1995).........13

Ira Robbins, *Guilty Without Charge: Assessing the Due Process Rights of
  Unindicted Co-Conspirators*, 2004 Fed. Cts. L. Rev. 1 (2004) ...........................4

Rayeed N. Tayeh, *Implicated But Not Charged: Improving Due Process For
  Unindicted Co-Conspirators*, 47 Akron L. Rev. 2 (2014) ...................................3

Intervenor-Appellant John Doe ("Doe") respectfully submits this emergency motion for a stay pending appeal of (i) the district court's May 10, 2016, Opinion and Order (the "May 10 Order") (Exhibit A), which directed the Government to publicly release a letter identifying a list of "unindicted co-conspirators" that includes him (the "Conspirator Letter") in *United States v. Baroni*, No. 15-cr-193 (SDW) (the "Criminal Action"); and (ii) the district court's denial of Doe's motion to stay the May 10 Order pending full briefing and argument on Doe's objection to the release of the Conspirator Letter (the "May 13 Order") (Exhibit B).  In the May 13 Order, the district court also denied Doe's motion for a stay pending appeal.

## PRELIMINARY STATEMENT

A number of courts around the country have concluded that it is a due process violation for the Government to label someone an unindicted co-conspirator.  Here, the district court ordered the Government to disseminate a letter so labeling Doe, not because she disagreed with those decisions, but because they are not binding on her. (Exhibit B, May 13 Order at 4 ("Doe cites to no binding authority that stands for the proposition that his Due Process rights will be violated by being identified as an unindicted co-conspirator.").)  Thus, unless this Court stays that Order to consider whether it agrees or disagrees with this long line of authority,  Doe will be publicly identified as an unindicted co-conspirator—and thus irreparably harmed—by noon on Tuesday, May 17, 2016, without the benefit of a judicial decision on that critical

1

issue.  (Exhibit C, Dkt. # 38.)

This Court should not permit that to happen.  Regardless of whether the Court ultimately agrees or disagrees with those courts to have held that the Government violates due process by labeling one an unindicted co-conspirator, it should not allow the district court's order to stand without first addressing that core constitutional question.  Rather, the Court should stay the district court's order and determine whether, in the Third Circuit as elsewhere, the Government violates the Due Process clause of the Constitution if it labels someone an unindicted co-conspirator without first providing him with notice and an opportunity to be heard as to the truth of that accusation.

I.    **THE COURT SHOULD ENTER AN EMERGENCY STAY PENDING APPEAL BECAUSE ABSENT A STAY, DOE WILL BE BRANDED A CRIMINAL WITHOUT DUE PROCESS.**

When considering a motion to stay pending appeal pursuant to Fed. R. App. P. 8(a), a court must examine: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also* Charles Alan Wright et al., 11 *Fed. Prac. & Proc. Civ.* § 2904 (3d ed. 2015).  "[T]he standard for obtaining a stay pending appeal is essentially the same as that for obtaining a preliminary

injunction.'"" *Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of HHS*, No. 13-1144, 2013 U.S. App. LEXIS 2706 (3d Cir. Feb. 8, 2013).  Here, Doe satisfies all the criteria for a stay.

### 1.    Likelihood of Success on the Merits

a)    Identifying Doe as an unindicted co-conspirator without affording a forum in which to challenge the designation deprived him of due process.

Doe has a likelihood of success on the merits because every court to consider the question has held that identifying one as an unindicted co-conspirator without providing him a forum to challenge that accusation is a violation of due process.  *See In re Smith*, 656 F.2d 1101 (5th Cir. 1981); *United States v. Chadwick*, 556 F.2d 450 (9th Cir. 1977); *United States v. Briggs*, 514 F.2d 794, 803 (5th Cir. 1975); *Doe v. Hammond*, 502 F. Supp. 2d 94 (D.D.C. 2007); *United States v. Anderson*, 55 F. Supp. 2d 1163 (D. Kan. 1999); *Application of Jordan*, 439 F. Supp. 199, 204-09 (S.D.W.Va. 1977); *see generally* Rayeed N. Tayeh, *Implicated But Not Charged: Improving Due Process For Unindicted Co-Conspirators*, 47 Akron L. Rev. 2, 552 (2014) ("Publicly naming unindicted co-conspirators, either in an indictment, in pre-trial filings, or during plea hearings, affixes a stigma of criminal culpability upon them.  This stigma may result in irreparable harm to their reputations, employment prospects, business interests, and ability to participate in public life."); Ira Robbins, *Guilty Without Charge: Assessing the Due Process Rights of Unindicted Co-*

3

*Conspirators*, 2004 Fed. Cts. L. Rev. 1 (2004).   And while this Court has not squarely addressed the issue, the court in *United States v. Christian*, 660 F.2d 892 (3d Cir. 1991), echoed *Briggs*'s statement that "the practice of using presentments has disappeared in the federal system and is not provided for in F.R.Crim.P. Rules 6 and 7," *id.* at 901 (quoting *Briggs*, 514 F.2d at 803 n.14).   *Briggs* made that observation to support its central tenet:  "The courts have struck down with strong language efforts by grand juries to accuse persons of crime while affording them no forum in which to vindicate themselves," *Briggs*, 514 F.2d at 803.

The Indictment the grand jury returned in the Criminal Action defines "conspirator" as "defendant BARONI, defendant KELLY, ***and others***, including [David] Wildstein" who "decided to punish [Fort Lee] Mayor Sokolich by deliberately causing significant traffic problems in Fort Lee through a reduction in the number of Local Access Lanes [to the GWB], all under the false pretense of a traffic study." (Exhibit D, Indictment, ¶ 4 (emphasis supplied).)  The grand jury thus accused the unnamed "others" referred to in Paragraph 4—the unindicted co-conspirators, whom the Government later unilaterally determined included Doe—of committing a federal crime.  Thereafter, during pretrial proceedings in the Criminal Action, the Government advised the defense and the court of that accusation.

While releasing that information to the court and the defense ***may have been*** appropriate, making that accusation public would certainly violate Doe's due

4

process rights. More than forty years ago, in *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971), the Supreme Court observed that "where the state attaches a 'badge of infamy' to the citizen, due process comes into play." In two cases decided in the decade immediately following *Constantineau*, the Fifth Circuit addressed in particular the due process implications of naming unindicted co-conspirators. In *Briggs*, the Fifth Circuit correctly observed: "The grand jury that returns an indictment naming a person as an unindicted conspirator does not perform its shielding function but does exactly the reverse." *Id.* at 803. The *Briggs* court went on to note that "[i]f the charges are baseless, the named person should not be subjected to public branding, and if supported by probable cause he should not be denied a forum." *Id.*; *see also Chadwick*, 556 F.2d at 450 ("charging appellant with the offense without making him a defendant was beyond the authority of the grand jury and a denial of due process"); *Jordan*, 439 F. Supp. at 204-09 ("There can be little doubt that the naming of persons as unindicted co-conspirators is a 'calumniation of private citizens.'") (citations omitted). Six years after *Briggs*, the Fifth Circuit decided *In re Smith*, 656 F.2d 1101 (5th Cir. 1981), which extended this rule beyond the grand jury context by ordering that other court documents naming an unindicted co-conspirator be sealed and struck from the record because, the court said, it could "think of no reason to distinguish between an official defamation originating from a federal grand jury or an Assistant United States

5

Attorney." *Id.* at 1106.

The principles announced in *Briggs* and *Smith* continue to resonate today.  In *Hammond*, 502 F. Supp. 2d 94 (D.D.C. 2007), the court noted that "revealing [one's] identity as an unindicted co-conspirator" has generally been found "to violate the due process rights of the person revealed." *Id.* at 101-02.  And after noting that a number of courts have adopted those principles, the court in *United States v. Anderson*, 55 F. Supp. 2d 1163 (D. Kan. 1999), explained the analysis such cases demand, holding that when considering a challenge to the identification of an unindicted co-conspirator, "the court must undertake a due process balancing inquiry, balancing the interests of the government in naming unindicted co-conspirators against the individual harm that stems from being accused without having a forum in which to obtain vindication." *Id.* at 1167.  Because the court failed to undertake the proper balancing test its conclusions are fatally flawed, making Doe's likelihood of success particularly high.

As noted above, the district court reasoned that Doe had failed to show that he had been denied due process because he "cite[d] to no binding authority that stands for the proposition that his Due Process rights will be violated by being identified as an unindicted co-conspirator." (Exhibit B, May 13 Order at 4.)  It is true that this Court is not bound by the decisions of the Fifth Circuit, the Ninth Circuit or the district courts of other circuits.  But the fact that this Court has not

6

addressed that issue did not excuse the district court from doing so.  Doe faces being publicly declared a criminal by the United States Attorney without having been afforded any process to dispute that characterization.  He asked the district court to prevent that from happening because such a declaration would violate his due process rights.  In response to that request, it was not enough for the district court to say that she was not bound by stare decisis to agree with him; it was incumbent upon her to say whether she did or did not agree with his claim of a due process violation, and why.

And there are sound reasons to credit Doe's due process claim.  The circuit and district court decisions finding that the Government violates due process by labeling one an unindicted co-conspirator—*i.e.*, *Briggs* and its progeny—all derived from and extended the Supreme Court's holding in *Constantineau*, 400 U.S. 433. *See, e.g.*, *Briggs*, 514 F.2d at 798 (citing *Constantineau*, 400 U.S. at 435-37).  That authority, moreover, has stood for more than four decades and its logic is unassailable.  That authority is sound, and this Court should definitively embrace it.

> b)     The Conspirator Letter is not a judicial filing to which the presumptive right of access attaches.

Contrary to the district court's determination (Exhibit B, May 13 Order at 4), the Conspirator Letter is ***not*** a bill of particulars or any other judicial filing to which the public's presumptive right of access attaches; rather, it is nothing more than a discovery letter that should have been sent to the criminal defendants without being

7

filed. *Compare United States v. Smith*, 776 F.2d 1104, 1105-06 (3d Cir. 1985), in which the district court granted the criminal defendants' motion for a bill of particulars and the "Government filed a two-page document under seal with the Clerk of Court setting forth the required information in compliance with the Court's order." Although the defense in the Criminal Action moved for a bill of particulars, the court did not grant that motion. Instead, the Government agreed to provide a discovery letter apprising the defense of the individuals it had chosen to designate "unindicted co-conspirators," and then voluntarily chose to send the court a courtesy copy of that letter. There was neither a requirement nor any valid reason for the Government to have sent that discovery letter to the court, and the fact that it did so did ***not*** trigger the presumptive public right of access that applies to indictments, bills of particulars, and other valid judicial filings. Were a party's courtesy letters to the court sufficient to trigger public access, any party to a criminal case (prosecution or defense) could freely defame third parties—in the same manner in which Doe would be defamed here—by the libelous *per se* act of accusing such absent parties of crimes based on the unilateral determination of that party. The presumptive right of public access was surely not intended to extend to such letters.

The district court disregarded this showing by reasoning that the Conspirator Letter was a "judicial record." (Exhibit B, May 13 Order at 4.) But a document is

only considered a "judicial record" when it has "'been filed[1] with, placed under seal, interpreted or enforced by the district court.'" *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 781 (3d Cir. 1994); *see also Pichler v. UNITE*, 585 F.3d 741, 746 n.5 (3d Cir. 2009) ("[B]ecause the documents the NRTW seeks have never been filed with the district court, they are not judicial records, and, therefore, the NRTW cannot obtain access to them under the right of access doctrine."); *In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001) ("The status of a document as a 'judicial record' . . . depends on whether a document has been filed with the court, or otherwise somehow incorporated or integrated into a district court's adjudicatory proceedings.  While filing clearly establishes such status, a document may still be construed as a judicial record, absent filing, if a court interprets or enforces the terms of that document, or requires that it be submitted to the court under seal." (internal citation omitted)).

None of these circumstances is present here.  The Conspirator Letter was subject to an informal request to be "maintained under seal"—not pursuant to any court order—but rather "pursuant to internal policies of the U.S. Attorney's office." (Exhibit B, May 13 Order at 4.)  Even had the Conspirator Letter been subject to a

---

[1]  Fed. R. Crim. P. 49(d) states that filings in a criminal action (which is the type of action in which the Government issued the Conspirator Letter) are governed by the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 5(d)(2) states, "[a] paper is filed by delivering it: (A) to the clerk; or (B) to a judge who agrees to accept it for filing, and who must then note the filing date on the paper and promptly send it to the clerk."  That did not happen here.

confidentiality order, that would still not be enough to convert it to a judicial record. *See Pansy*, 23 F.3d at 782 ("Simply because a court has entered a confidentiality order over documents does not automatically convert those documents into 'judicial records' accessible under the right of access doctrine.  For example, when a court enters an order of protection over documents exchanged during discovery, and these documents have not been filed with the court, such documents are not, by reason of the protective order alone, deemed judicial records to which the right of access attaches.").  This was unquestionably not the case in *Smith*, where, as shown above, the government had actually filed a list under seal.

> c)    The district court applied the wrong balancing test.

Additionally, the district court asserted that Doe's "privacy rights were considered in this Court's May 10 Order in its application of the *Smith* balancing test and in *in camera* proceedings before this Court during which time Doe was given the opportunity to be heard orally and in writing."  (Exhibit B, May 13 Order at 4.)  But the critical issue is not simply Doe's "privacy rights," but rather his constitutional right to due process.  That right is unquestionably more significant than Doe's privacy rights (which themselves are substantial), and dictates an entirely different analysis.  *See Anderson*, 55 F. Supp. 2d at 1167 (explaining that "a due process balancing inquiry" requires "balancing the interests of the government in naming unindicted co-conspirators against the individual harm that stems from being

10

accused without having a forum in which to obtain vindication.").  Indeed, *Smith*, 776 F.2d 1104, did not even mention, let alone weigh, an unindicted co-conspirator's due-process rights.

Nor can the district court's analysis withstand scrutiny under *Smith*, 776 F.2d 1104.  The district court reasoned that this case is dissimilar from *Smith* because the Conspirator Letter was limited to "those individuals for 'whom the Government has sufficient evidence to designate as having joined the conspiracy.'"  (Exhibit A, May 10 Order at 6.)  But that fact *magnifies* the harm, because it goes beyond a mere accusation of criminality to state—without any context or opportunity for the co-conspirators to defend themselves—that the Government actually has evidence of their criminality.  *See Smith*, 776 F.2d at 1113 ("If published, the sealed list will communicate to the general public that the named individuals, in the opinion of the chief federal law enforcement official of the District, are guilty, or may be guilty, of a felony involving breaches of the public trust. This broad brush assertion will be unaccompanied by any facts providing a context for evaluating the basis for the United States Attorney's opinion with respect to any given individual.").  And here, unlike in *Smith*, there is an even greater certainty that the Conspirator Letter will name innocent individuals because, despite its lengthy investigation and considered decision to prosecute, the Government has decided *not* to charge these individuals. *See Smith*, 776 F.2d at 1113 ("When one adds to [the risk of harm the fact] that the

United States Attorney's opinion was formed on the basis of an investigation that had not yet reached the point where he was willing to make a decision on whether to prosecute, it becomes apparent that the risk of serious injury to innocent third parties is a grave one."). That the district court deemed the individuals named on the Conspirator Letter to be "public employees and/or elected and appointed officials," (Exhibit A, May 10 Order at 5-6), does not deprive them of their innocence and their right to maintain it. Indeed, *Smith* itself rejected the suggestion that the status of an unindicted co-conspirator as a public employ should weigh in favor of disclosure, or even be relevant to the inquiry. *Smith*, 776 F.2d at 1114.

Although the district court held that it gave Doe "notice and an opportunity to be heard," (Exhibit B, May 13 Opinion at 4.), the due process clause demands more than that one be permitted to raise a due process claim; he must actually get the process due him. Because Doe was not given the opportunity to establish that he is ***not*** a co-conspirator, he was not given the process due him before he could permissibly be so labelled. And that Doe's privacy rights were considered does not mean that the court considered his constitutional right not to be branded a criminal without any process all. It did not.

## 2.    Irreparable Harm

Doe will suffer irreparable harm absent the relief sought because once he is named as an unindicted co-conspirator at noon on May 17, the stigma that the

12

Government believes there is evidence that he entered an agreement to shut down traffic at the George Washington Bridge to retaliate against Mayor Sokolich can never be removed.   If the Government releases the Conspirator Letter, his constitutional right against being branded with a "badge of infamy" through criminal accusations he has no means of contesting will be forfeit.  *See, e.g.*, *Constantineau*, 400 U.S. at 437; *United States v. Briggs*, 514 F.2d at 803; *Smith*, 656 F .2d at 1106; *Chadwick*, 556 F.2d at 450; *Hammond*, 502 F. Supp. 2d at 101-02; *Anderson*, 55 F. Supp. 2d at 1167; *Jordan*, 439 F. Supp. at 204-09.

The district court observed in passing that Doe "ha[d] not articulated any irreparable harm other than possible 'stigma' in being named an unindicted co-conspirator."  (Exhibit B, May 13 Order at 5 n.1.)  But "[i]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"  *Rodriguez v. Robbins*, 715 F.3d 1127, 1144 (9th Cir. 2013) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Fitzgerald v. Mountain Laurel Racing, Inc.*, 607 F.2d 589, 601 (3d Cir. 1979) (finding that plaintiff had "established the possibility of irreparable injury 'to his business and reputation' from an alleged violation of a Commission Rule implying dishonest racing to warrant a preliminary injunction."); Charles Alan Wright et al., 11A *Fed. Prac. & Proc.* § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no

further showing of irreparable injury is necessary."). Moreover, as these cases recognize, being named an unindicted co-conspirator not only can cause stigmatization, but can have grave adverse impacts on current and future employment opportunities.

### 3.    Balance of the Equities

Third, as the district court correctly observed, the balance of the equities weighs in Doe's favor because there is simply "no urgency" to the media's request for the Conspirator Letter. (Exhibit B, May 13 Order at 5 n.1.) Indeed, there will be no harm to the nonmoving party—here, the media—from entry of a stay.[2] There is no urgent need for the media to know the identities of the unindicted co-conspirators, and staying the order to give Doe an opportunity to demonstrate that it was improvidently granted will not harm the media in the least. As noted above, the balancing test the district court undertook in deciding to order the release of the Conspirator Letter identifying unindicted co-conspirators considered the wrong interests. The court based its ruling on a balancing of "the public's right of access

---

[2]   The media argued strenuously that Doe's application was untimely. While the district court ultimately rejected that argument in an abundance of caution, Doe's challenge to the court's Order was in no event untimely because he could properly have made that challenge after the court issued its May 10th Order by filing a separate lawsuit against the United States Attorney rather than, as he did, filing a motion to intervene in this action. *See Martin v. Wilks*, 490 U.S. 755, 763-65 (1989). As that suit would promptly have been consolidated with this action, it made little sense to add that procedural step.

and governmental interests." (Exhibit A, May 10 Order at 4.) Not surprisingly, it resolved that balance in the public's favor, correctly observing that "[t]here is very little that is private about the lane closures or the lives of the people allegedly connected to them." (*Id.* at 5.) That balancing test, however, flatly ignores the interests—indeed, the fundamental constitutional rights—of those persons the grand jury branded "unindicted co-conspirators" with no process at all. That is because, in seeking to resist disclosing the names of those individuals, the Government argued that their privacy interests were sufficiently compelling to outweigh the public's right of access, but did not raise their fundamental, constitutional right not to be branded criminals without due process of law. Privacy is well beside the point; at this juncture, as the district court observed, the unindicted co-conspirators' privacy rights have already been greatly diminished. But their right not to be cast as criminals is not diminished one whit. That sacred right—the right not to be branded a criminal without due process of law—will never be diminished, no matter how much media attention the Bridgegate fiasco attracts.

### 4.    Public Interest

Fourth, the public interest favors a stay because Doe's due process rights are paramount to the media's curiosity. As noted above, while the public undoubtedly has an interest in the criminal case against William Baroni and Bridget Kelly, it has no comparable interest in knowing Doe's identity. To the extent any unindicted co-

conspirator has taken any action relevant to the criminal case, that conduct and the actor's identity will be learned at trial, where it can be placed in context.

## CONCLUSION

For the reasons set forth above, Doe respectfully requests that the Court issue a stay pending Doe's appeal.

Respectfully submitted,


/s/ Jenny R. Kramer
Jenny R. Kramer
**CHADBOURNE & PARKE LLP**
1301 Avenue of the Americas
New York, NY 10019-6022
(212) 408-1054

Dated: May 14, 2016                    *Counsel for Intervenor John Doe*

16

# EXHIBIT A

<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

NORTH JERSEY MEDIA GROUP, ET AL.,

Movants,

v.

UNITED STATES OF AMERICA, ET AL.,

Respondents.

Civil Action No: 16-267(SDW)

**AMENDED OPINION**

May 10, 2016

**WIGENTON**, District Judge.

Before this Court are 1) North Jersey Media Group, Inc., Bloomberg L.P., NBCUniversal Media, LLC, The New York Times Company, New Jersey Advanced Media, Dow Jones & Company, Inc., The Associated Press, Public Media NJ, Inc., New York Public Radio, American Broadcasting Companies, Inc., Philadelphia Media Network, PBC, and Politico's (collectively "Media") Motion to Intervene and For Access to Documents in the matter of *United States v. William E. Baroni, Jr. and Bridget Anne Kelly*, Criminal Action No. 15-193 ("Criminal Matter");[1]

---

[1] This motion was originally filed as part of the Criminal Matter docket, but was then moved to this separate civil docket ("Civil Matter"). For the purposes of this opinion, unless otherwise noted, all references to docket entries refer to the criminal docket.

and 2) The Port Authority of New York and New Jersey's ("Port Authority") Motion to Intervene to oppose the Media's Motion for Access to Documents.

For the reasons stated herein, the Motions to Intervene are GRANTED and the Media's Motion for Access to Documents is GRANTED in part and DENIED in part.

## I.    BACKGROUND AND PROCEDURAL HISTORY

This Court assumes familiarity with the allegations and procedural history of this case and reviews only the facts relevant to the present motion.  On April 23, 2015, Defendants William E. Baroni, former Deputy Executive Director of the Port Authority of New York and New Jersey and Bridget Anne Kelly, former Deputy Chief of Staff for Legislative and Intergovernmental Affairs for the Office of the Governor of New Jersey ("OGNJ") (collectively, "Defendants') were indicted by the United States Attorney's Office for the District of New Jersey ("USAO") on charges of conspiracy, fraud and civil rights violations for their alleged roles in causing lane closures on the George Washington Bridge in September 2013.  (Dkt. No. 1, Indictment.)  The Indictment also references unnamed and unindicted co-conspirators.  (*Id.* at 5-7.)

Discovery in the Criminal Matter is subject to a Protective Order.  (Dkt. No. 22.)  The Protective Order applies to Confidential Discovery Materials produced by the Government and provides that if those materials are subsequently filed, they shall be filed "provisionally under seal."  (*Id.* ¶ 4.)  Confidential Discovery Materials are defined as: "(1) Information of a personal nature including family and financial matters; (2) HIPPA information; (3) Personal contact information; (4) Information about governmental and business matters not related to the Indictment; and (5) Search warrant applications and affidavits."  (*Id.*)  The Protective Order further provides that a party has ten days after such filing to make a formal motion to seal.  (*Id.*)  "If no motion to seal is filed, or such motion is denied, the materials shall be unsealed."  (*Id.*)

In November, 2015, Defendants filed partially redacted motions seeking bills of particulars which requested, among other things, the names of any unindicted co-conspirators. (Dkt. Nos. 42 at 4-10, 43 at 50-60.) Defendants have not formally moved to seal those motions.[2] In response, the Government agreed to "identify any other individual about whom the Government has sufficient evidence to designate as having joined the conspiracy." (Dkt. No. 45 at 31.) On January 11, 2016, the Government submitted a letter with that information to this Court and Defendants ("Conspirator Letter"). The Conspirator Letter was not filed on the docket nor have its contents been made public. Although the Government requested that this Court maintain the letter under seal, it has not made a formal motion to do so.[3]

On January 13, 2016, the Media filed the instant motion, seeking an order permitting them to intervene in the Criminal Matter and granting them access to: 1) the Conspirator Letter; 2) all sealed or redacted materials for which a formal motion to seal has not been properly filed; and 3) any and all materials produced pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) ("*Brady* materials"). (Media Mot. 1-2.) On February 16, 2016, the Government timely filed its opposition and the Port Authority moved to intervene in order to oppose the Media's motion. The Media filed its reply on February 26, 2016. As there is no opposition to either the Media or the Port Authority

---

[2] Although the parties have not filed formal motions to seal those redacted briefs and exhibits, the Port Authority has. Specifically, the Port Authority filed motions to seal 1) a memorandum by Gibson, Dunn & Crutcher LLP and its cover email attached to Defendant Baroni's moving papers, and 2) an email exchange between Port Authority executives regarding an unrelated civil matter attached to Defendant Kelly's reply brief. (Dkt. Nos. 47, 60, Port Authority Mot. at 2-3.) The Media "believe the documents in both Port Authority motions are not completely unrelated to the allegations in the Indictment" and have requested "an opportunity to be heard more fully if the Court decides to permit intervention." (Media Mot. at 6, n. 2.) However, this Court has since granted the Port Authority's motions. (Dkt. Nos. 78, 82.) The documents covered by those orders shall remain sealed and the Media's request to be heard is denied.

[3] Defendant Baroni objected to both the manner in which the Government submitted the Conspirator Letter and its request to seal its contents. (Dkt. Nos. 61, 68.)

intervening (Gov't. Opp. Br. 8, Media Reply at 1, n. 1, 3.), those motions shall be granted. The only issue before this Court, therefore, is the scope of the materials to which the Media shall have access.

## II.    DISCUSSION

In order to "promote[] important societal interests including confidence in the judicial system," *In re Newark Morning Ledger Co.*, 260 F.3d 217, 220 (3d Cir. 2001), both the First Amendment and the common law provide the public with a right of access to criminal judicial proceedings and records. *See Globe Newspaper Co. v. Superior Court of Norfolk Cty.*, 457 U.S. 596, 604 (1982) (noting that the "press and general public have a constitutional right of access to criminal trials") (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980)); *In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001) (stating that "[i]t is well-settled that there exists, in both criminal and civil cases, a common law public right of access to judicial proceedings and records"); *United States v. Smith*, 776 F.2d 1104, 1107 (3d Cir. 1985) (stating that the "public's right of access to at least some judicial proceedings is now beyond peradventure"). That access is not absolute, however, and requires a balancing between the public's right of access and governmental interests. *See, e.g., United States v. Sealed Search Warrants*, Nos. 99-1096, 99-1097, 99-1098, 1999 WL 1455215, at *4 (D.N.J. Sept. 2, 1999). With that in mind, this Court turns to the Media's requests for access.

A.  List of Unindicted Co-Conspirators

The First Amendment and the common law rights of access "extend to bills of particulars." *Smith*, 776 F.2d at 1111. Because the First Amendment is implicated, ensealment of a list of co-conspirators produced in response to a demand for a bill of particulars is only permissible if it "'is necessitated by a compelling governmental interest, and is narrowly tailored to serve that

interest.'" *Id.* at 112 (quoting *Press Enterprise*, 464 U.S. 501, 540 (1984); *Globe Newspaper Co.*, 457 U.S. at 607)).

Here, the Government argues that "the privacy interests of uncharged third parties, who have no opportunity to vindicate themselves at trial" is such a compelling interest. (Gov't Opp. Br. at 8.) To do so, it relies on the Third Circuit's decision in *Smith*, which affirmed the district court's decision to deny a media motion to unseal a list of unindicted co-conspirators, finding that the privacy interests of those named outweighed the public's right to know their identities. *Smith*, 776 F.2d at 1114. That reliance is misplaced.

In finding a compelling privacy interest, the *Smith* court noted that the Government had a "broadly conceptualized list of unindicted co-conspirators," which included not only persons who the Government believed were unindicted co-conspirators, but also those who "*could conceivably be considered* as unindicted co-conspirators." (*Id.* at 1114, 1113 (emphasis in original).) Further, at the time the media sought to intervene, the Government had "not yet reached the point where [the U.S. Attorney] was willing to make a decision on whether to prosecute." *Id.* As Judge Mansmann emphasized in his concurrence, the privacy interests of the unnamed persons in *Smith* were uniquely compelling because the U.S. Attorney had produced "an overbroad bill of particulars" in order to give the government "great latitude in the description of the crime charged." *Id.* at 1116-17 (Mansmann, J., concurring).

The facts in the instant matter are different. The underlying events that gave rise to the Indictment have been extensively covered by the media, such that even persons tangentially involved have already been identified and exposed in the press. There is very little that is private about the lane closures or the lives of the people allegedly connected to them. Further, individuals thus far identified as being involved in the lane closings have been public employees and/or elected

5

and appointed officials, and anyone named in the Conspirator Letter is likely to have held a similar position. As the *Smith* court noted, "the public has a substantial interest in the integrity or lack of integrity of those who serve them in public office." *Id.* at 1114; *see also id.* at 1116 (Mansmann, J., concurring) (stating that public employees and elected officials "cannot claim a right of privacy with respect to the manner in which they perform their duties. Where a criminal trial allegedly involves violations of the public trust by government officials, the public's need to monitor closely the judicial proceedings is perforce increased."); *United States v. Kushner*, 349 F. Supp. 2d 892, 906-07 (D.N.J. 2005) (noting that the "public has a strong interest in the use officials make of their positions of public trust"). In addition, the Government has limited the scope of the Conspirator Letter to those individuals for "whom the Government has sufficient evidence to designate as having joined the conspiracy." (Dkt. No. 45 at 31.) Although privacy for third-parties is indeed important, this Court is satisfied that the privacy interests of uncharged third parties are insufficiently compelling to outweigh the public's right of access. Disclosure is appropriate and the Media's motion for access to the list of unindicted co-conspirators is granted.

     B.  Sealed or Redacted Materials Not Sealed Pursuant to a Formal Motion to Seal

The Media also seeks access to "the Sealed Documents filed in this proceeding pursuant to the Protective Order, which were provisionally sealed and for which no motion for permanent seal has been filed." (Media Br. at 17.) Under the Federal Rules of Criminal Procedure, courts may adopt protective orders for "good cause." FED. R. CRIM. P. 16(d)(1) (recognizing a court's power to "deny, restrict, or defer discovery or inspection"). The Protective Order was entered after extensive negotiation between the parties and is narrowly drawn to protect the privacy of others, to prevent the exposure of governmental and business matters that are unrelated to the charges in the Indictment, and to maintain judicial fairness while avoiding unnecessary doubt under public

scrutiny.   To achieve those goals, when Confidential Discovery Materials are filed, they are provisionally sealed.  The Protective Order then requires a formal motion to seal to be filed within ten days, or the material is to be unsealed.  As neither Defendants nor the Government have moved to seal their filings, the Media argues that those materials must be made available to the public under the order's plain terms.[4]

Before doing so, however, this Court will permit Defendants and the Government to each file a single motion out of time to seal any material previously submitted but not subject to a formal motion to seal.[5]  This Court will then review and rule on those motions.  If no such motion(s) are made, the currently redacted or provisionally sealed materials will be made public.  Going forward, the parties must comply with the express terms of the Protective Order, or move to amend it.  The Media's motion for access to sealed or redacted materials which have not been sealed pursuant to a formal motion to seal, therefore, is denied without prejudice.[6]

### III.    CONCLUSION

---

[4] The Media requests, in the alternative, that this Court modify or lift the Protective Order.  (Media Br. at 1, 20.) This Court is satisfied that the Protective Order is properly drawn and will not exercise its discretion to alter it or lift it at this time.

[5] This is required even if the parties agreed the documents should remain under seal.  The Government's position that a formal motion to seal is not necessary where the parties consented to seal certain materials, (Gov't. Opp. at 17, 22), is unavailing.  Such an agreement does not abrogate either side's obligation to follow the express terms of the Protective Order, nor does it grant them the authority to expand its reach.

[6] The alleged *Brady* material sought by the Media is contained in the redacted documents the Media seeks to have unsealed. (Media Br. at 19.)  The Media argues that the Third Circuit's decision in *United States v. Wecht*, 484 F.3d 194 (3d Cir. 2007) recognizes a global right of access to *Brady* materials and, consequently, for access to these documents in particular. This Court reserves any decision as to whether to unseal the materials in question until after such time as the Defendants and/or Government file, and this Court reviews, the formal motions to seal discussed above.  Further, as there been no ruling on whether the documents at issue constitute *Brady* materials, this Court takes no position as to whether *Wecht* mandates access to them, except to note that the *Wecht* court explicitly limited its decision to the facts before it.  *Id.* at 211.

For the reasons set forth above, the Media's Motion to Intervene is GRANTED and Motion for Access to Materials is GRANTED in part and DENIED in part.  The Port Authority's Motion to Intervene is also GRANTED.  An appropriate order follows.

_____ /s/ Susan D. Wigenton _____

SUSAN D. WIGENTON, U.S.D.J

Orig:        Clerk
cc:          Parties

8

<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NORTH JERSEY MEDIA GROUP, ET AL., | Civil Action No: 16-267(SDW) |
| Movants, | **AMENDED ORDER** |
| v. | |
| UNITED STATES OF AMERICA, ET AL., | May 10, 2016 |
| Respondents. | |

**WIGENTON**, District Judge.

This matter having come before this Court on 1) Movants North Jersey Media Group, Inc.,

Bloomberg L.P., NBCUniversal Media, LLC, The New York Times Company, New Jersey

Advanced Media, Dow Jones & Company, Inc., The Associated Press, Public Media NJ, Inc., New

York Public Radio, American Broadcasting Companies, Inc., Philadelphia Media Network, PBC,

and Politico's (collectively "Media") Motion to Intervene and For Access to Documents in the

matter of *United States v. William E. Baroni, Jr. and Bridget Anne Kelly*, Criminal Action No. 15-

193 ("Criminal Matter"); and 2) The Port Authority of New York and New Jersey's ("Port

Authority") Motion to Intervene to oppose the Media's Motion for Access to Documents; and this

Court having considered the submissions of the parties; and for good cause shown:

**IT IS** on this 10th day of May, 2016,

**ORDERED** that the Media's Motion to Intervene is hereby **GRANTED**; and it is further

**ORDERED** that the Media's Motion for Access to Documents is **GRANTED** as to the list of unindicted co-conspirators submitted to this Court by the Government on January 11, 2016; and it is further

**ORDERED** that the Media's Motion for Access to Documents is **DENIED WITHOUT PREJUDICE** as to materials submitted under provisional seal for which no formal motion to seal has been filed; and it is further

**ORDERED** that the parties to the Criminal Matter have ten (10) days from the date of this Order to file formal out of time motions to seal materials submitted to this Court in redacted form as required by the Protective Order currently in place in the Criminal Matter.  Any materials not addressed in a formal motion to seal shall be made public; and it is further

**ORDERED** that the Port Authority's Motion to Intervene is **GRANTED**; and it is further

**ORDERED** that this civil matter is **CLOSED**.

**SO ORDERED.**


_____/s/ Susan D. Wigenton_____

SUSAN D. WIGENTON, U.S.D.J


Orig:        Clerk
cc:          Parties

2

# EXHIBIT B

<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
DISTRICT OF NEW JERSEY

CHAMBERS OF
**SUSAN D. WIGENTON**
UNITED STATES DISTRICT JUDGE

MARTIN LUTHER KING COURTHOUSE
50 WALNUT ST.
NEWARK, NJ 07101
973-645-5903

May 13, 2016

Jenny Kramer, Esq.
Chadbourne & Parke LLP
1301 Avenue of the Americas
New York, NY 10019-6022
*Attorneys for Intervenor John Doe*

Bruce S. Rosen, Esq.
McCusker, Anselmi, Rosen & Carvelli, PC
210 Park Avenue, Suite 301
P.O. Box 240
Florham Park, NJ 07932
*Attorneys for Movants North Jersey Media Group, Inc.  et al.*

David W. Feder, Esq.
J. Fortier Imbert, Esq.
Lee M. Cortes, Esq.
Vikas Khanna, Esq.
U.S. Department of Justice
Office of the United States Attorney
District of New Jersey
970 Broad Street, Suite 700
Newark, NJ 07102
*Attorneys for the United States of America*

Michael A. Baldassare, Esq.
Jennifer Mara, Esq.
Dillon Hoey Malar, Esq.
Baldassare & Mara, LLC
570 Broad Street, Suite 900
Newark, NJ 07102
*Attorneys for Defendant William E. Baroni, Jr.*

Michael D. Critchley, Esq.
Critchley, Kinum & Vasquez, LLC
75 Livingston Avenue
Roseland, NJ 07068
*Attorneys for Defendant Bridget Anne Kelly*

David Robert Kromm, Esq.
The Port Authority of New York and New Jersey
4 WTC
150 Greenwich Street – 24th Floor
New York, NY 1007
*Attorney for Interested Party Port Authority*

**LETTER ORDER FILED WITH THE CLERK OF THE COURT**

    Re:    **North Jersey Media Group, Inc. et al. v. United States of America et al.**
            **Civil Action No. 16-267 (SDW)**

Counsel:

    Before this Court is Proposed Intervenor John Doe's ("Doe") 1) Emergent Motion to Intervene, to Proceed Anonymously, and to Stay this Court's May 10, 2016 Order directing the Government to make public the Conspirator Letter, and 2) Motion for Stay Pending Appeal pursuant to Federal Rule of Appellate Procedure 8(a)(2)(A). This Court having considered the parties' submissions, and for the reasons discussed below, grants Doe's motions to intervene and to proceed anonymously and denies his motions for a stay and for a stay pending appeal.

**DISCUSSION**

    A.  <u>Request for Intervention</u>

    Federal Rule of Civil Procedure 24(a) provides for two means of intervention in matters pending in federal court: intervention as of right and permissive intervention. *ACR Energy Partners, LLC v. Polo North Country Club, Inc.*, 309 F.R.D. 191, 192 (D.N.J. 2015); *see generally* Fed. R. Civ. P. 24. Intervention as of right exists where: "(1) the application for intervention is timely; (2) the applicant has a sufficient interest in the litigation; (3) the interest may be affected or impaired, as a practical matter, by the disposition of the action; and (4) the interest is not adequately represented by an existing party in the litigation." *Mountain Top Condo. Ass'n v. Dave Stabbert Builder, Inc.*, 72 F.3d 361, 365-66 (3d Cir. 1995). Alternatively, a court may "permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1). Under either path to intervention, the motion to intervene must be timely. *See, e.g. Gen. Refractories Co. v. First State Ins. Co.*, No 04-3509, 2012 WL 262647, at *7 (E.D. Pa. Jan. 30, 2012). Timeliness is "determined by the totality of the circumstances," *United States v. Alcan Aluminum, Inc.*, 25 F.3d 1174, 1181 (3d Cir. 1994), and in exercising its discretion to make such a determination, the trial court must consider, "(1) the stage of the proceeding; (2) the prejudice that delay may cause the parties; and (3) the reason for the delay." *Mountain Top*, 72 F.3d at 369. In considering the "temporal component to the timeliness inquiry" a court should look to when "an applicant knows, or should know, its rights are directly affected by the litigation . . .." *Alcan*, 25 F.3d at 1182-83.

Looking first to timeliness, this Court is puzzled by Doe's failure to intervene sooner in this matter, given the four-month window between the public filing of the Media's January 13, 2016 motion for access to records and the entry of this Court's May 10th Opinion and Order. In addition to the docketing of the motion, the extensive media coverage was more than sufficient to put him on notice that his interests were at stake. Doe had every opportunity to intervene during the pendency of that motion, yet waited to do so until after the Order was entered. As Doe's moving papers fail to indicate why he did not seek to protect his rights sooner, this Court can only speculate as to the strategy behind such a choice. However, in an abundance of caution, and in light of the interest Doe has in this matter as a person whose name may be released to the public as an unindicted co-conspirator, and noting that his interests were not expressly represented by either Movants or Respondents, this Court grants Doe's motion to intervene pursuant to Federal Rule of Civil Procedure 24.

B. Request to Proceed Anonymously

Federal Rule of Civil Procedure 10(a) states that case captions must "name all the parties." FED. R. CIV. P. 10(a); *see also Doe v. Megless*, 654 F.3d 404, 408 (3d Cir. 2011) (noting that the rule "requires parties to a lawsuit to identify themselves in their respective pleadings."). However, "courts have recognized that a party may, under limited circumstances, proceed by way of pseudonym . . .." *Doe v. Oshrin*, 299 F.R.D. 100, 102 (D.N.J. 2014). "The decision to allow a plaintiff to proceed anonymously rests within the sound discretion of the court." *Id*. at 103. The Third Circuit requires the trial court to weigh factors that favor anonymity such as:

> (1) the extent to which the identity of the litigant has been kept confidential; (2) bases upon which disclosure is feared or sought to be avoided, and the substantiality of these bases; (3) the magnitude of the public interest in maintaining the confidentiality of the litigant's identity; (4) whether, because of the purely legal nature of the issues presented or otherwise, there is an atypically weak public interest in knowing the litigant's identities; (5) the undesirability of an outcome adverse to the pseudonymous party and attributable to his refusal to pursue the case at the price of being publicly identified; and (6) whether the party seeking to sue pseudonymously has illegitimate ulterior motives, *Megless*, 654 F.3d at 409,

against factors disfavoring anonymity such as:

> The universal level of public interest in access to the identities of litigants; (2) whether, because of the subject matter of this litigation, the status of the litigant as a public figure, or otherwise, there is a particularly strong interest in knowing the litigant's identities, beyond the public's interest which is normally obtained; and (3) whether the opposition to pseudonym by counsel, the public, or the press is illegitimately motivated.

*Id.*

Here, the purpose of Doe's motion is to maintain the anonymity he currently possesses as an unindicted co-conspirator whose name has not been publicly released. Although this Court is unpersuaded that Doe will be wrongfully "brand[ed] . . . as a criminal," (Doe Mot. at 1), requiring him to identify himself defeats the very purpose of his motion to stay this Court's Order directing the Government to disclose the contents of the Conspirator Letter. Given that Doe's identity has been kept confidential until this point, Doe's motion to proceed anonymously is granted.

C.  Request for Stay

A party seeking a stay must show: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).

Turning first to his likelihood of success on the merits, Doe contends that 1) the Conspirator Letter is not a bill of particulars or judicial record to which the public has a right of access but rather is a "courtesy copy" of a discovery document sent to the Court, and 2) "identifying him as an unindicted co-conspirator without providing him a forum to challenge that designation would undeniably deprive him of due process." (Doe Mot. at 9.) This Court disagrees.

First, the Conspirator Letter was submitted to this Court and Defendants in response to Defendants' motions for bills of particulars. The Government requested that the document be maintained under seal, pursuant to internal policies of the U.S. Attorney's office "regarding bills of particulars that identify unindicted co-conspirators." (Gov't. Opp'n Br. to Media Mot. Intervene, Dkt. No. 26 at 7-8.) The document was never labeled a courtesy copy, nor has the Government included this Court in other exchanges of mere discovery material. Therefore, this Court deemed the Conspirator Letter a judicial record, and applied the Third Circuit's analysis in *United States v. Smith*, 776 F.2d 1104 (3d Cir. 1985) to balance the public's right of access to judicial records and proceedings against the Government's interest in maintaining the seal on such documents to determine that the public's compelling interest outweighed the privacy interests of those identified in the letter. (Dkt. Nos. 33 & 34.) Doe does not address the Court's analysis, nor provide a counter-analysis under the *Smith* standard.

Second, Doe fails to show that he has been denied Due Process. Doe cites to no binding authority that stands for the proposition that his Due Process rights will be violated by being identified as an unindicted co-conspirator. Nor does Doe acknowledge that his privacy rights were considered in this Court's May 10th Opinion in its application of the *Smith* balancing test and in *in camera* proceedings before this Court during which time Doe was given the opportunity to be heard orally and in writing. This Court does not take the identification of unindicted co-conspirators lightly, recognizing the possible reputational consequences of such a revelation. However, here, this Court has given Doe notice and an opportunity to be heard and has thoroughly considered his privacy interests in determining that the Conspirator Letter should be made public. Pursuant to the dictates of Due Process, Doe has been heard by this Court.

Because Doe has not shown a likelihood of success on the merits, this Court need not reach the remaining three factors for injunctive relief.[1]  Therefore, Doe's request for a stay is denied.  As the standard for a stay pending appeal is "essentially the same as that for obtaining a preliminary injunction," *Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of HHS*, No. 13-1144, 2013 WL 1277419, at *1 (3d Cir. Feb.8, 2013), this Court also denies Doe's request for a stay pending appeal.

**CONCLUSION**

For the reasons set forth above,

**IT IS** on this 13th day of May, 2016,

ORDERED that Doe's Motion to Intervene is **GRANTED**, and it is further

ORDERED that Doe's Motion to Proceed Anonymously is **GRANTED**, and it is further

ORDERED that Doe's Motion for a Stay is **DENIED**, and it is further

ORDERED that Doe's Motion for a Stay Pending Appeal is **DENIED**.

**SO ORDERED**.

_____/s/ Susan D. Wigenton_____

SUSAN D. WIGENTON, U.S.D.J

Orig:   Clerk
cc:     Parties

---

[1] This Court notes, however, that Doe has not articulated any irreparable harm other than possible "stigma" in being named an unindicted co-conspirator.  (Doe Mot. at 11.)  As to a balancing of the equities, they do weigh in Doe's favor because, although the Media has a great interest in knowing the contents of the Conspirator Letter, there is no urgency to their request.  Finally, the public interest does not favor issuance of a stay.  As noted in this Court's May 10th Opinion and Order, the public has a presumptive right of access to the Conspirator Letter pursuant to the First Amendment.  As Doe concedes in his papers, this stay will likely only delay the inevitable, as his identity and alleged role in the lane closures "will be learned at trial."  (Doe Mot. at 12.)

5

# EXHIBIT C

**U.S. District Court**
**District of New Jersey [LIVE] (Newark)**
**CIVIL DOCKET FOR CASE #: 2:16-cv-00267-SDW**

NORTH JERSEY MEDIA GROUP INC. et al v. UNITED          Date Filed: 01/13/2016
STATES OF AMERICA et al                                Date Terminated: 05/10/2016
Assigned to: Judge Susan D. Wigenton                   Jury Demand: None
Cause: 28:1331 Fed. Question                           Nature of Suit: 890 Other Statutory
                                                       Actions
                                                       Jurisdiction: Federal Question

<u>Movant</u>

**NORTH JERSEY MEDIA GROUP**          represented by   **BRUCE S. ROSEN**
**INC.**                                               MCCUSKER, ANSELMI, ROSEN &
*Publishers of Northjersey.com as well*                CARVELLI, PC
*as The Record and The Herald News*                    210 PARK AVENUE, SUITE 301
                                                       PO BOX 240
                                                       FLORHAM PARK, NJ 07932
                                                       (973) 635-6300
                                                       Fax: (973) 635-6363
                                                       Email: brosen@marc-law.com
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

<u>Movant</u>

**BLOOMBERG L.P.**                    represented by   **BRUCE S. ROSEN**
*The owner and operator of Bloomberg*                  (See above for address)
*News*                                                 *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

<u>Movant</u>

**NBCUNIVERSAL MEDIA, LLC**           represented by   **BRUCE S. ROSEN**
*doing business as*                                    (See above for address)
WNBC-TV Channel 4                                      *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

<u>Movant</u>

**THE NEW YORK TIMES**                represented by   **BRUCE S. ROSEN**
**COMPANY**                                            (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

<u>Movant</u>

**NEW JERSEY ADVANCED MEDIA**         represented by   **BRUCE S. ROSEN**
*Publishers of nj.com*                                 (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**DOW JONES & COMPANY, INC.**                    represented by   **BRUCE S. ROSEN**
*The publisher of the Wall Street Journal*                    (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Movant**

**THE ASSOCIATED PRESS**                         represented by   **BRUCE S. ROSEN**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Movant**

**PUBLIC MEDIA NJ, INC.**                        represented by   **BRUCE S. ROSEN**
*doing business as*                                           (See above for address)
NJTV                                                          *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Movant**

**NEW YORK PUBLIC RADIO**                        represented by   **BRUCE S. ROSEN**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Movant**

**AMERICAN BROADCASTING**                        represented by   **BRUCE S. ROSEN**
**COMPANIES, INC.**                                           (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Movant**

**PHILADELPHIA MEDIA**                           represented by   **BRUCE S. ROSEN**
**NETWORK, PBC**                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Movant**

**POLITICO**

**Respondent**

**UNITED STATES OF AMERICA**                     represented by   **DAVID WILLIAM FEDER**
                                                              OFFICE OF THE U.S. ATTORNEY
                                                              DISTRICT OF NEW JERSEY
                                                              970 BROAD STREET
                                                              ROOM 700

NEWARK, NJ 07102
973-645-2700
Email: david.feder@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**J. FORTIER IMBERT**
OFFICE OF THE U.S. ATTORNEY
DISTRICT OF NEW JERSEY
970 BROAD STREET
NEWARK, NJ 07102
973-645-2890
Email: j.imbert@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**LEE M. CORTES**
OFFICE OF THE U.S. ATTORNEY
DISTRICT OF NEW JERSEY
970 BROAD STREET
SUITE 700
NEWARK, NJ 07102
973-645-2742
Email: lee.cortes@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**VIKAS KHANNA**
OFFICE OF THE U.S. ATTORNEY
970 BROAD STREET
ROOM 700
NEWARK, NJ 07102
973-297-2080
Email: vkhanna@usa.doj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Respondent**

**WILLIAM E. BARONI, JR.**          represented by **DILLON HOEY MALAR**
BALDASSARE & MARA LLC
570 BROAD STREET
SUITE 900
NEWARK, NJ 07102
973-200-4066
Email: dmalar@mabalaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JENNIFER MARA**

BALDASSARE & MARA, LLC
570 Broad Street, Suite 900
Newark, NJ 07102
973-200-4066
Fax: 973-556-1076
Email: jmara@mabalaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**MICHAEL A. BALDASSARE**
BALDASSARE & MARA LLC
570 BROAD STREET
SUITE 900
NEWARK, NJ 07102
973-200-4066
Fax: 973-556-1071
Email: mbaldassare@mabalaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Respondent**

**BRIDGET ANNE KELLY**                  represented by  **MICHAEL D. CRITCHLEY**
Critchley, Kinum & DeNoia, LLC
75 Livingston Avenue
Suite 303
Roseland, NJ 07068
(973) 422-9200
Fax: 973-422-9700
Email: mcritchley@critchleylaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor**

**John Doe**                  represented by  **JENNY R. KRAMER**
CHADBOURNE & PARKE LLP
1301 AVENUE OF THE AMERICAS
NEW YORK, NY 10019
212-408-1054
Email: jkramer@chadbourne.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Interested Party**

**THE PORT AUTHORITY OF NEW**                  represented by  **DAVID ROBERT KROMM**
**YORK AND NEW JERSEY**                  THE PORT AUTHORITY OF NEW
YORK AND NEW JERSEY

4 WTC
150 Greenwich Street - 24th Floor
NEW YORK, NY 10007
212-435-3483
Email: dkromm@panynj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/13/2016 | 1 | MOTION to Unseal Document by AMERICAN BROADCASTING COMPANY, BLOOMBERG L.P., DOW JONES & COMPANY, INC., NBCUNIVERSAL MEDIA, LLC, NEW JERSEY ADVANCED MEDIA, NEW YORK PUBLIC RADIO, NORTH JERSEY MEDIA GROUP INC., PUBLIC MEDIA NJ, INC., THE ASSOCIATED PRESS, THE NEW YORK TIMES COMPANY. (Attachments: # 1 Cover Letter, # 2 Declaration, # 3 Memorandum of Law, # 4 Text of Proposed Order)(anr) (Entered: 01/15/2016) |
| 01/15/2016 | | Set/Reset Deadlines as to 1 MOTION to Unseal Document. Motion set for 2/16/2016 before Judge Susan D. Wigenton. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (anr) (Entered: 01/15/2016) |
| 01/15/2016 | 2 | Letter from Bruce S. Rose, Esq. request that American Broadcasting Company ("ABC") be added as Movant. (anr) (Entered: 01/15/2016) |
| 01/19/2016 | 3 | Letter from Bruce S. Rosen. (ROSEN, BRUCE) (Entered: 01/19/2016) |
| 01/20/2016 | 4 | Corporate Disclosure Statement by AMERICAN BROADCASTING COMPANY identifying The Walt Disney Company as Corporate Parent.. (ROSEN, BRUCE) (Entered: 01/20/2016) |
| 01/20/2016 | 5 | Corporate Disclosure Statement by THE ASSOCIATED PRESS identifying None as Corporate Parent.. (ROSEN, BRUCE) (Entered: 01/20/2016) |
| 01/20/2016 | 6 | Corporate Disclosure Statement by BLOOMBERG L.P. identifying Bloomberg, Inc. as Corporate Parent.. (ROSEN, BRUCE) (Entered: 01/20/2016) |
| 01/20/2016 | 7 | ORDER granting request by Movants that the Philadelphia Media Network, PBC be added as Movant to this action. Signed by Judge Susan D. Wigenton on 1/20/2016. (anr) (Entered: 01/20/2016) |
| 01/20/2016 | 8 | ORDER granting request by Movants that American Broadcasting Company, ABC be added as Movant to this action. Signed by Judge Susan D. Wigenton on 1/20/2016. (msd) (Entered: 01/20/2016) |
| 01/20/2016 | 9 | Corporate Disclosure Statement by NEW JERSEY ADVANCED MEDIA identifying Advance Publications, Inc. as Corporate Parent.. (ROSEN, BRUCE) (Entered: 01/20/2016) |
| 01/20/2016 | 10 | |

| | | |
|---|---|---|
| | | Corporate Disclosure Statement by NORTH JERSEY MEDIA GROUP INC. identifying Macromedia Incorporated as Corporate Parent.. (ROSEN, BRUCE) (Entered: 01/20/2016) |
| 01/20/2016 | 11 | Corporate Disclosure Statement by THE NEW YORK TIMES COMPANY identifying None as Corporate Parent.. (ROSEN, BRUCE) (Entered: 01/20/2016) |
| 01/20/2016 | 12 | Corporate Disclosure Statement by PUBLIC MEDIA NJ, INC. identifying WNET as Corporate Parent.. (ROSEN, BRUCE) (Entered: 01/20/2016) |
| 01/20/2016 | 13 | Corporate Disclosure Statement by NBCUNIVERSAL MEDIA, LLC identifying Comcast Corporation as Corporate Parent.. (ROSEN, BRUCE) (Entered: 01/20/2016) |
| 01/20/2016 | 14 | Corporate Disclosure Statement by DOW JONES & COMPANY, INC. identifying News Corporation and Ruby Newco, LLC as Corporate Parent.. (ROSEN, BRUCE) (Entered: 01/20/2016) |
| 01/20/2016 | 15 | Letter from Bruce S. Rosen. (ROSEN, BRUCE) (Entered: 01/20/2016) |
| 01/25/2016 | 16 | Corporate Disclosure Statement by PHILADELPHIA MEDIA NETWORK, PBC identifying The Institute for Journalism in New Media, LLC and Philadelphia Media Network PBC Charitable Trust as Corporate Parent.. (ROSEN, BRUCE) (Entered: 01/25/2016) |
| 01/27/2016 | 17 | NOTICE of Appearance by DAVID ROBERT KROMM on behalf of THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY (KROMM, DAVID) (Entered: 01/27/2016) |
| 01/29/2016 | 18 | APPLICATION/PETITION for Modified Briefing Schedule (on Consent) for by UNITED STATES OF AMERICA. (FEDER, DAVID) (Entered: 01/29/2016) |
| 02/01/2016 | 19 | MOTION for Extension of Time to File Response/Reply *by Letter to Judge Wigenton* by THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY. (KROMM, DAVID) (Entered: 02/01/2016) |
| 02/02/2016 | | CLERK'S QUALITY CONTROL MESSAGE - The 19 MOTION for Extension of Time to File Response/Reply filed by DAVID KROMM on 2/1/2016 was submitted incorrectly as a MOTION. PLEASE RESUBMIT THE DOCUMENT USING the event LETTER (Other filings - Other Documents - Letter). This submission will remain on the docket unless otherwise ordered by the court. (mfg) (Entered: 02/02/2016) |
| 02/02/2016 | 20 | Letter. (KROMM, DAVID) (Entered: 02/02/2016) |
| 02/02/2016 | 21 | MODIFIED SCHEDULING ORDER: Respondent shall respond to Movants January 13. 2016 motion on or before February 16, 2016; movants shall file any reply on or before February 26. 2016; the return date for the motion shall be determined by the Court. Signed by Judge Susan D. Wigenton on 2/2/2016. (mfg, ) (Entered: 02/02/2016) |
| 02/02/2016 | 22 | ORDER granting the Port Authority's request to follow the same briefing schedule set forth in the Consent Application for Modified Scheduling Order [D.E. 18], extending the Port Authority's time to respond to 2/16/2016. re 20 |

| | | |
|---|---|---|
| | | Letter. Signed by Judge Susan D. Wigenton on 2/2/2016. (mfg, ) (Entered: 02/02/2016) |
| 02/09/2016 | 23 | Letter from Bruce S. Rosen. (ROSEN, BRUCE) (Entered: 02/09/2016) |
| 02/11/2016 | 24 | Corporate Disclosure Statement by POLITICO identifying Perpetual Capital, LLC as Corporate Parent.. (ROSEN, BRUCE) (Entered: 02/11/2016) |
| 02/16/2016 | 25 | MOTION to Intervene *AND OPPOSITION TO THE MOTION OF NORTH JERSEY MEDIA GROUP, INC. et al* by THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY. (Attachments: # 1 MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO INTERVENE AND IN OPPOSITION TO THE MOTION OF NORTH JERSEY MEDIA GROUP, INC. et al, # 2 Certificate of Service)(KROMM, DAVID) (Entered: 02/16/2016) |
| 02/16/2016 | 26 | MEMORANDUM in Opposition filed by UNITED STATES OF AMERICA re 1 MOTION to Unseal Document (Attachments: # 1 Certificate of Service) (FEDER, DAVID) (Entered: 02/16/2016) |
| 02/18/2016 | | Set Deadlines as to 25 MOTION to Intervene AND OPPOSITION TO THE MOTION OF NORTH JERSEY MEDIA GROUP, INC. et al. Motion set for 3/21/2016 before Judge Susan D. Wigenton. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (seb) (Entered: 02/18/2016) |
| 02/18/2016 | | CLERK'S QUALITY CONTROL MESSAGE - A Text Proposed Order page was not submitted with the Motion to Intervene 25 submitted by David Kromm on 2/16/2016. PLEASE SUBMIT THE MISSING DOCUMENT by using the event Letter and attaching the Text Proposed Order page to a cover letter. (seb) (Entered: 02/18/2016) |
| 02/18/2016 | 27 | Letter from David R. Kromm. (Attachments: # 1 Text of Proposed Order For Motion [D.E. 25])(KROMM, DAVID) (Entered: 02/18/2016) |
| 02/26/2016 | 28 | Letter from Michael Baldassare in Response to Section III.C. of the Government's Opposition Brief re 26 Memorandum in Opposition of Motion. (BALDASSARE, MICHAEL) (Entered: 02/26/2016) |
| 02/26/2016 | 29 | REPLY BRIEF to Opposition to Motion filed by AMERICAN BROADCASTING COMPANIES, INC., BLOOMBERG L.P., DOW JONES & COMPANY, INC., NBCUNIVERSAL MEDIA, LLC, NEW JERSEY ADVANCED MEDIA, NEW YORK PUBLIC RADIO, NORTH JERSEY MEDIA GROUP INC., PHILADELPHIA MEDIA NETWORK, PBC, POLITICO, PUBLIC MEDIA NJ, INC., THE ASSOCIATED PRESS, THE NEW YORK TIMES COMPANY re 25 MOTION to Intervene *AND OPPOSITION TO THE MOTION OF NORTH JERSEY MEDIA GROUP, INC. et al*, 1 MOTION to Unseal Document (Attachments: # 1 Letter requesting to file overlength brief with consent)(ROSEN, BRUCE) (Entered: 02/26/2016) |
| 05/10/2016 | 30 | OPINION. Signed by Judge Susan D. Wigenton on 5/10/2016. (seb) (Entered: 05/10/2016) |
| | | |

| 05/10/2016 | 31 | ORDER granting 25 Media's Motion to Intervene; and it is further ORDERED that the Media's Motion for Access to Documents is GRANTED as to the list of unindicted co-conspirators submitted to this Court by the Government on January 11, 2016; and it is further ORDERED that the Media's Motion for Access to Documents is DENIED WITHOUT PREJUDICE as to materials submitted under provisional seal for which no formal motion to seal has been filed; and it is further ORDERED that the parties to the Criminal Matter have ten (10) days from the date of this Order to file formal out of time motions to seal materials submitted to this Court in redacted form as required by the Protective Order currently in place in the Criminal Matter. Any materials not addressed in a formal motion to seal shall be made public; and it is further ORDERED that the Port Authority's Motion to Intervene is GRANTED.. Signed by Judge Susan D. Wigenton on 5/10/2016. (seb) (Entered: 05/10/2016) |
|---|---|---|
| 05/10/2016 | | ***Civil Case Terminated. (seb) (Entered: 05/10/2016) |
| 05/10/2016 | 32 | Letter from Bruce S. Rosen. (ROSEN, BRUCE) (Entered: 05/10/2016) |
| 05/10/2016 | 33 | AMENDED OPINION (Correcting caption only). Signed by Judge Susan D. Wigenton on 5/10/16. (gh, ) (Entered: 05/10/2016) |
| 05/10/2016 | 34 | AMENDED ORDER (Correcting caption only). Signed by Judge Susan D. Wigenton on 5/10/16. (gh, ) (Entered: 05/10/2016) |
| 05/11/2016 | 35 | TEXT ORDER: Pursuant to this Court's May 10, 2016 Amended Opinion and Amended Order (Dkt. Nos. 33 & 34), Respondent United States of America shall file the list of unindicted co-conspirators on the docket no later than 12:00 pm (noon) on Friday, May 13, 2016. So Ordered by Judge Susan D. Wigenton on 5/11/16. (cds, ) Modified on 5/11/2016 (Soto). (Entered: 05/11/2016) |
| 05/12/2016 | 36 | Letter from Bruce S. Rosen. (ROSEN, BRUCE) (Entered: 05/12/2016) |
| 05/12/2016 | 37 | Emergency MOTION to Intervene *, To Proceed Anonymously, And To Stay The Court's May 10, 2016 Order* by John Doe. (Attachments: # 1 Brief In Support Of John Doe's Motion To Intervene And Stay The Court's May 10, 2016 Order Requiring The United States To Release A List Of Names Of Unindicted Co-Conspirators In United States v. Baroni And Kelly, # 2 Text of Proposed Order, # 3 Certificate of Service)(KRAMER, JENNY) (Entered: 05/12/2016) |
| 05/13/2016 | | Set Deadlines as to 37 Emergency MOTION to Intervene, To Proceed Anonymously, And To Stay The Court's May 10, 2016 Order. Motion set for 6/6/2016 before Judge Susan D. Wigenton. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (seb) (Entered: 05/13/2016) |
| 05/13/2016 | 38 | TEXT ORDER: This Court is in receipt of the emergent motion filed by John Doe (Docket Entry # 37). North Jersey Media Group, Inc., et al. (Movants) and Respondents are hereby permitted to file written opposition to this Court no later than 12:30 p.m. today. Given the pendency of the emergent motion, this Court hereby amends its previously ordered disclosure deadline of 12:00 p.m. today. The new deadline is hereby set for Tuesday, May 17, 2016 at 12:00 p.m. Parties |

| | | |
|---|---|---|
| | | are further directed to disregard the automated court notice scheduling the motion as returnable on June 6, 2016.. So Ordered by Judge Susan D. Wigenton on 5/13/16. (cds, ) (Entered: 05/13/2016) |
| 05/13/2016 | 39 | RESPONSE to Motion filed by UNITED STATES OF AMERICA re 37 Emergency MOTION to Intervene , *To Proceed Anonymously, And To Stay The Court's May 10, 2016 Order* (FEDER, DAVID) (Entered: 05/13/2016) |
| 05/13/2016 | 40 | BRIEF in Opposition filed by AMERICAN BROADCASTING COMPANIES, INC., BLOOMBERG L.P., DOW JONES & COMPANY, INC., NBCUNIVERSAL MEDIA, LLC, NEW JERSEY ADVANCED MEDIA, NEW YORK PUBLIC RADIO, NORTH JERSEY MEDIA GROUP INC., PHILADELPHIA MEDIA NETWORK, PBC, POLITICO, PUBLIC MEDIA NJ, INC., THE ASSOCIATED PRESS, THE NEW YORK TIMES COMPANY re 37 Emergency MOTION to Intervene , *To Proceed Anonymously, And To Stay The Court's May 10, 2016 Order* (ROSEN, BRUCE) (Entered: 05/13/2016) |
| 05/13/2016 | 41 | REPLY to Response to Motion filed by John Doe re 37 Emergency MOTION to Intervene , *To Proceed Anonymously, And To Stay The Court's May 10, 2016 Order* (KRAMER, JENNY) (Entered: 05/13/2016) |
| 05/13/2016 | 42 | LETTER ORDER Granting Doe's 37 Motion to Intervene, and it is further Ordered that Doe's Motion to Proceed Anonymously is Granted, and it is further Ordered that Doe's Motion for Stay is Denied, and it is further Ordered that Doe's Motion for a Stay Pending Appeal is Denied. Signed by Judge Susan D. Wigenton on 5/13/2016. (th, ) (Entered: 05/13/2016) |
| 05/13/2016 | 43 | NOTICE OF APPEAL as to 34 Order, 42 Order on Motion to Intervene, 33 Opinion by John Doe. Filing fee $ 505. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Certificate of Service)(KRAMER, JENNY) (Entered: 05/13/2016) |

# EXHIBIT D

2014R00025/LMCJR/VK/JFI/DF

RECEIVED

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

APR 2 3 2015

AT 8:30_____M
WILLIAM T. WALSH
CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Susan D. Wigenton |
| | : | |
| v. | : | Crim. No. 15- 193 |
| | : | |
| WILLIAM E. BARONI, JR. and | : | 18 U.S.C. §§ 241, 242, 371, |
| BRIDGET ANNE KELLY | : | 666(a)(1)(A), 1343, 1349, and 2. |

**INDICTMENT**

The Grand Jury, in and for the District of New Jersey, sitting at Newark, charges:

**COUNT 1**

**(Conspiracy to Obtain by Fraud, Knowingly Convert, and Intentionally
Misapply Property of an Organization Receiving Federal Benefits)**

THE DEFENDANTS

1.      During the time period relevant to Count 1 of the Indictment:

A.      Defendant WILLIAM E. BARONI, JR. ("defendant BARONI") was the Deputy Executive Director of the Port Authority of New York and New Jersey (the "Port Authority"), its second highest ranking executive. Defendant BARONI was appointed as the Deputy Executive Director by the Governor of the State of New Jersey, Christopher J. Christie, in or about February 2010, and served in that position until his resignation on or about December 13, 2013. As the Deputy Executive Director of the Port Authority, defendant BARONI, together with the Executive Director of the Port Authority (the "Executive Director"), was responsible for the general supervision of all aspects of the Port Authority's business, including the operations of Port Authority transportation facilities.  Defendant BARONI was an agent of the Port Authority, within the meaning of Title 18, United States Code, Section 666(d)(1).

B.    Defendant BRIDGET ANNE KELLY ("defendant KELLY") was an employee of the Office of the Governor of the State of New Jersey (the "Governor's Office") and served as Deputy Chief of Staff for Legislative and Intergovernmental Affairs ("IGA") from in or about April 2013 to on or about January 9, 2014. Prior to that appointment, defendant KELLY was the Director of IGA, reporting to the previous Deputy Chief of Staff for IGA.

### OTHER INDIVIDUALS AND ENTITIES

C.    David Wildstein ("Wildstein") was the Director of Interstate Capital Projects for the Port Authority and an associate of defendant BARONI and defendant KELLY. In or about May 2010, defendant BARONI hired Wildstein for his Port Authority position, which Wildstein held until his resignation from the Port Authority became effective on or about December 13, 2013. Notwithstanding his title, Wildstein operated as defendant BARONI's chief of staff and as the second highest ranking New Jersey executive at the Port Authority. Wildstein was an agent of the Port Authority, within the meaning of Title 18, United States Code, Section 666(d)(1).

D.    The Port Authority was an organization that operated transportation and other facilities in New York and New Jersey. The Executive Director of the Port Authority was appointed by the Governor of New York, and the Deputy Executive Director was appointed by the Governor of New Jersey. The Port Authority also had a twelve-person Board of Commissioners, six of whom were appointed by the Governor of New Jersey (including the Chairperson) and six of whom were appointed by the Governor of New York (including the Vice-Chairperson).

E.    During the period beginning January 1, 2013 through December 31, 2013, the Port Authority received benefits in excess of $10,000 under Federal programs involving

grants, contracts, subsidies, loans, guarantees, insurance, or other forms of Federal assistance, within the meaning of Title 18, United States Code, Sections 666(b) and 666(d)(5).

F.    The George Washington Bridge ("GWB") was a facility owned and operated by the Port Authority that spanned the Hudson River between the Borough of Manhattan in New York and the Borough of Fort Lee in New Jersey ("Fort Lee"). The GWB had both an upper level and a lower level, each of which served both eastbound traffic into New York and westbound traffic into New Jersey. Vehicles traveling eastbound from New Jersey into New York paid tolls at one of three toll plazas: (1) the lower level toll plaza; (2) the upper level toll plaza; and (3) the toll plaza for the Palisades Interstate Parkway, which also led to the upper level of the GWB.

G.    The upper level toll plaza had twelve toll booths, which the Port Authority owned and operated. During normal operations, some of the twelve toll booths were designated to accept payment using only the electronic toll collection system known as "E-Z Pass," and others, serviced by toll booth operators, were designated to accept cash and E-Z Pass. The twelve toll booths at the upper level toll plaza of the GWB received traffic from two approaches: (1) what is known as the "Main Line," which included traffic from Interstate Highways 95 and 80, U.S. Route 46, and N.J. Route 4; and (2) an approach for local traffic traveling through the streets of Fort Lee (the "Local Approach"), which included a three-lane access road leading only to the upper level toll plaza (the "Local Access Lanes"). Traffic on the Main Line also fed into the ten toll booths at the lower level toll plaza of the GWB.

H.    Prior to September 9, 2013 and after September 13, 2013, during the weekday morning rush period from approximately 6 a.m. to 10 a.m. (also known as the "Peak Period"), the Port Authority typically used the three southernmost toll booths on the upper level toll plaza to handle the traffic traveling from the Local Access Lanes (the "Three Southernmost

Toll Booths"). Typically, during the Peak Period, one of the Three Southernmost Toll Booths was designated only for E-Z Pass use, while the other two toll booths were designated to accept both cash and E-Z Pass. During the Peak Period, the Port Authority used traffic cones to segregate the traffic from the Main Line from the traffic using the Local Access Lanes. The Local Access Lanes were not restricted to the exclusive use of the residents of Fort Lee.

I.      Mark J. Sokolich was the Mayor and a resident of Fort Lee ("Mayor Sokolich").

J.      Christopher J. Christie was the Governor of the State of New Jersey and a candidate for reelection in the New Jersey gubernatorial election conducted on November 5, 2013 ("Governor Christie").

K.      IGA was a component of the Governor's Office that monitored and facilitated the relationships between the Governor's Office and New Jersey state and local officials. IGA employed regional directors, each of whom was responsible for communicating with local officials, including mayors, in a particular region in New Jersey. Prior to November 5, 2013, certain IGA employees, including defendant KELLY, also played a role in seeking endorsements of Governor Christie's 2013 reelection from elected officials in New Jersey. To that end, IGA's regional directors were instructed at times to invite New Jersey local officials who might endorse, or might be persuaded to endorse, Governor Christie's reelection to functions associated with Governor Christie. These included sporting and entertainment events to which Governor Christie had access to tickets and events at Governor Christie's official state residence. One of the officials whose endorsement IGA employees sought was Mayor Sokolich, who received invitations to some of those functions.

1.    The New Jersey Assembly Transportation, Public Works, and Independent Authorities Committee (the "Assembly Transportation Committee") was a New Jersey state legislative committee that investigated certain activities related to the Port Authority.

2.    From in or about August 2013 to in or about December 2013, in the District of New Jersey and elsewhere, defendants

WILLIAM E. BARONI, JR. and<br>BRIDGET ANNE KELLY

knowingly and intentionally conspired and agreed with each other and others, including Wildstein, to obtain by fraud, otherwise without authority knowingly convert to their use and the use of others, and intentionally misapply property owned by and under the care, custody, and control of the Port Authority, with a value of at least $5,000, contrary to Title 18, United States Code, Section 666(a)(1)(A).

THE OBJECT OF THE CONSPIRACY

3.    The object of the conspiracy was to misuse Port Authority property to facilitate and conceal the causing of traffic problems in Fort Lee as punishment of Mayor Sokolich.

SUMMARY OF THE CONSPIRACY

4.    In or about August 2013, after defendant KELLY confirmed that Mayor Sokolich would not be endorsing Governor Christie for reelection in November 2013, defendant BARONI, defendant KELLY, and others, including Wildstein (the "Conspirators"), decided to punish Mayor Sokolich by deliberately causing significant traffic problems in Fort Lee through a reduction in the number of the Local Access Lanes—all under the false pretense of a traffic study.

5.    Between the mornings of September 9, 2013 and September 13, 2013, the Conspirators caused the Local Access Lanes to be reduced from three to one so that only one toll

booth, instead of the usual three, was accessible to the Local Approach. To maximize the congestion and thus the punitive impact on Mayor Sokolich, the Conspirators caused these lane and toll booth reductions to start on the first day of the school year in Fort Lee, without any advance notice to Mayor Sokolich, the Fort Lee Chief of Police, and the residents of Fort Lee. Just as the Conspirators had intended, the lane and toll booth reductions resulted in significant traffic in Fort Lee, both for motorists intending to access the GWB from the Local Approach and for the residents of Fort Lee, whose streets were choked with traffic backing up from the Local Approach.

6.      To enhance the effectiveness of their scheme, the Conspirators decided that any questions about the lane and toll booth reductions from Mayor Sokolich and other Fort Lee officials would be disregarded. To that end, the Conspirators purposely ignored communications from Mayor Sokolich, including his pleas for help, requests for information, and repeated warnings about the increased risks to public safety.

7.      Throughout the course of the conspiracy, the Conspirators concocted and promoted a sham story that reducing the number of lanes and toll booths accessible to the Local Approach was for a traffic study. They created and continually advanced this cover story so that they could use Port Authority property, including the time and services of unwitting Port Authority personnel and other resources, to implement the lane and toll booth reductions and to conceal the Conspirators' true punitive purpose.

MANNER AND MEANS OF THE CONSPIRACY

8.    To carry out the conspiracy and to effect its unlawful object, defendant BARONI, defendant KELLY, and others, including Wildstein, engaged in a variety of means and methods including, among others, those described below.

9.    Between in or about March 2011 and on or about August 12, 2013, Wildstein had separate discussions with defendant BARONI and defendant KELLY about how they could use the Local Access Lanes as leverage against Mayor Sokolich.

10.    Prior to on or about August 12, 2013, defendant KELLY expressed disappointment to Wildstein that Mayor Sokolich was not likely to endorse Governor Christie, despite IGA employees' efforts to obtain that endorsement. In response, Wildstein told defendant KELLY that they could use the Local Access Lanes to cause traffic problems in Fort Lee whenever it would be advantageous to do so.

11.    On August 12, 2013, defendant KELLY telephoned an employee of Governor Christie's reelection campaign who previously, as an IGA employee, had sought Mayor Sokolich's endorsement (the "Campaign Employee"). Defendant KELLY asked the Campaign Employee to confirm that Mayor Sokolich would not be endorsing Governor Christie. After the Campaign Employee confirmed that information, defendant KELLY responded that it was all she needed to know.

12.    On August 13, 2013, having confirmed that Mayor Sokolich would not be endorsing Governor Christie for reelection, defendant KELLY instructed Wildstein by email to implement their plan to punish Mayor Sokolich: "Time for some traffic problems in Fort Lee." Wildstein acknowledged his assent by responding, "Got it," and communicated defendant KELLY's instruction to defendant BARONI. Defendant BARONI agreed that Wildstein should

use the Local Access Lanes and the time and services of Port Authority personnel to cause traffic problems in Fort Lee.

13.    Soon thereafter, defendant KELLY confirmed for Wildstein that Mayor Sokolich was not endorsing Governor Christie for reelection and that the changes to the Local Access Lanes and resultant traffic problems in Fort Lee would punish Mayor Sokolich for not endorsing. Both defendant BARONI and Wildstein agreed to use the lanes for that purpose. To maintain consistency in dealing with Mayor Sokolich, defendant KELLY also conveyed to certain IGA employees that they should no longer interact with him.

14.    Reflecting their punitive purpose, on August 19, 2013, defendant KELLY and Wildstein exchanged the following text messages regarding a rabbi, who, like Mayor Sokolich, had fallen into disfavor:

| SOURCE | TEXT |
|---|---|
| WILDSTEIN CELL | "And he [the rabbi] has officially pissed me off" |
| KELLY CELL | "Clearly" |
| KELLY CELL | "We cannot cause traffic problems in front of his house, can we?" |
| WILDSTEIN CELL | "Flights to Tel Aviv all mysteriously delayed" |
| KELLY CELL | "Perfect" |

15.    Defendant BARONI, defendant KELLY, and Wildstein agreed to use the cover story of a traffic study as a justification for unwitting Port Authority personnel whose services would be used to implement the changes to the Local Access Lanes and as a means of concealing the true punitive purpose of the plan. They further agreed that Wildstein would enlist the services of the Port Authority Engineering department to make the traffic study cover story seem legitimate.

16.    Subsequently, Wildstein falsely told a Port Authority engineer (the "Engineer") that, to assess the traffic flow at the GWB upper level toll plaza, Wildstein was planning to remove the traffic cones that segregated the Main Line from the Local Approach. At Wildstein's direction, the Engineer and a Port Authority traffic engineer (the "Traffic Engineer") presented Wildstein with several alternative scenarios for altering the Local Access Lanes. In one such scenario, all of the traffic on the Local Access Lanes would merge from three lanes down to one and funnel into one toll booth. This single toll booth would service motorists using both cash and E-Z Pass, leaving no lane accessible to the Local Approach that would be dedicated for E-Z Pass users. Wildstein recommended that the single access lane and toll booth scenario would generate severe traffic problems in Fort Lee and inflict harsh punishment on Mayor Sokolich; defendant BARONI and defendant KELLY agreed.

17.    Wildstein had separate discussions with defendant BARONI and defendant KELLY regarding the timing of the lane and toll booth reductions. Defendant BARONI recommended against implementing the reductions in August when travel was traditionally lighter and the punitive impact would be lessened. Defendant BARONI, defendant KELLY, and Wildstein agreed that implementing the lane and toll booth reductions on September 9, 2013, which they knew was the first day of school for children in Fort Lee, would intensify Mayor Sokolich's punishment.

18.    To maximize the punitive impact of the lane and toll booth reductions, defendant BARONI, defendant KELLY, and Wildstein agreed not to give Mayor Sokolich and other Fort Lee officials advance notice. The lack of advance notice would prevent Fort Lee officials, including Fort Lee police officers, from preparing for the changes, and would keep Fort Lee residents and GWB commuters from altering their routes. They further agreed that the Port Authority and IGA would direct any resulting inquiries by Mayor Sokolich or other Fort Lee

officials to defendant BARONI as the Deputy Executive Director of the Port Authority. They also agreed that defendant BARONI would then deliberately ignore Mayor Sokolich and any other Fort Lee officials who inquired about the reductions.

19.    To minimize the risk of detection or leaks, defendant BARONI, defendant KELLY, and Wildstein agreed that Port Authority personnel would be given short notice to implement the lane and toll booth reductions. Even though they had agreed for some time to start the reductions on Monday, September 9, 2013, at 6:00 a.m. – in time for the morning rush hour – Wildstein, with the agreement of defendant BARONI and defendant KELLY, purposely waited until Friday, September 6, 2013, to order Port Authority personnel to implement the reductions.

20.    During his communications with Port Authority personnel in preparation for the lane and toll booth reductions, Wildstein – consistent with his discussions with defendant BARONI and defendant KELLY – falsely claimed that the lane and toll booth reductions were for a traffic study. Based on this misrepresentation, Port Authority personnel took steps to implement the reductions and to assess their impact on traffic.

21.    On Friday, September 6, 2013, Wildstein instructed a Port Authority manager with responsibility for the GWB (the "GWB Manager") to implement the lane and toll booth reductions on Monday, September 9, 2013, but not to notify any Fort Lee officials. After receiving Wildstein's directive, the GWB Manager: (A) arranged for Port Authority maintenance staff to cover traffic signs directing traffic to the Local Approach; (B) instructed GWB personnel to have an additional toll booth operator, who would be paid overtime, as a backup for the toll booth operator covering Toll Lane 24, the lone remaining toll booth that would be accessible to the Local Approach; and (C) arranged to have the Port Authority Police Department ("PAPD") work during an extended Peak Period to respond to additional traffic in Fort Lee from the Local Approach.

22.    That same day, Wildstein also advised the Engineer that the lane and toll booth reductions would begin on the morning of Monday, September 9, 2013. Consequently, the Engineer contacted the Traffic Engineer and instructed him to monitor the traffic consequences of the lane and toll booth reductions. Similarly, a Port Authority supervisor, who had responsibilities for the Port Authority's Tunnels, Bridges, and Terminals  department ("TB&T") (the "TB&T Manager"), discussed assessing the impact of the lane and toll booth reductions with one of the individuals who reported to him. Thus, on Friday, September 6, 2013 and during the lane and toll booth reductions, several Port Authority employees in the Traffic Engineering department and TB&T spent time collecting and reviewing traffic data, believing it was necessary to do so.

23.    The preparations for and implementation of the lane and toll booth reductions marked a clear departure from standard Port Authority traffic study procedures. These procedures normally do not necessitate or involve sudden, unannounced, and extreme disruptions for motorists, particularly during rush hour. Rather, the Port Authority ordinarily conducts traffic studies without actually affecting traffic, such as by using existing traffic data or computer models.

24.    Wildstein kept defendant KELLY and defendant BARONI informed about the steps he was taking to implement the lane and toll booth reductions. For example, on Saturday, September 7, 2013, Wildstein sent an email to defendant KELLY that stated, "I will call you Monday AM to let you know how Fort Lee goes," to which defendant KELLY responded, "Great." Also, on Sunday, September 8, 2013, Wildstein forwarded to defendant BARONI an email that Wildstein had received from the GWB Manager describing what Port Authority personnel had done to prepare for the lane and toll booth reductions and Port Authority resources that would be needed:

> Ops [Operations] is on board, Mtce [Maintenance] is covering
> signs tonight, and [Port Authority] Police are aware that they will
> be controlling traffic in the intersections for the extended rush.
> We've also brought a toll collector in on overtime to keep toll lane
> 24 (the extreme right hand toll lane Upper level) in the event the
> collector assigned to TL 24 needs a personal.

25.    On the morning of Monday, September 9, 2013, as defendant BARONI, defendant KELLY, and Wildstein intended, the lane and toll booth reductions caused significant traffic congestion for motorists traveling within Fort Lee. The congestion resulting from the reductions also spoiled a legitimate Port Authority traffic study at Center and Lemoine Avenues in Fort Lee, which caused the Port Authority to repeat the study.

26.    On the first morning of the reductions – Monday, September 9, 2013 – Wildstein went to the GWB to observe the impact personally. In separate telephone conversations with defendant BARONI and defendant KELLY, Wildstein reported his observations that the lane and toll booth reductions had, as intended, caused terrible traffic in Fort Lee. Defendant BARONI and defendant KELLY expressed satisfaction that their scheme was working and agreed to continue the reductions.

27.    Within hours of the lane and toll booth reductions, defendant BARONI received an email that Mayor Sokolich had called "re: urgent matter of public safety in Fort Lee." Defendant BARONI forwarded the email to Wildstein, who responded by sending an email reiterating that defendant BARONI should not respond: "radio silence." As defendant BARONI, defendant KELLY, and Wildstein had agreed, defendant BARONI refused to contact or reply to Mayor Sokolich.

28.    Wildstein forwarded to defendant KELLY the email from defendant BARONI about Mayor Sokolich's telephone call regarding an "urgent matter of public safety in Fort Lee." Later that day, defendant KELLY and Wildstein exchanged emails confirming their strategy:

| SOURCE | TEXT |
|---|---|
| KELLY EMAIL | "Did he [defendant BARONI] call him [Mayor Sokolich] back?" |
| WILDSTEIN EMAIL | "Radio silence His name comes right after mayor Fulop" |
| KELLY EMAIL | "Ty [Thank you]" |

Wildstein's mention of "Fulop" referred to the coordinated and deliberate refusal by the Conspirators to communicate with, meet, or respond to Steven Fulop, the Mayor of Jersey City, beginning in or about late July 2013 because the Conspirators understood that Mayor Fulop was not endorsing Governor Christie's reelection.

29.    Later in the morning of September 9, 2013, defendant BARONI, Wildstein, and the TB&T Manager received an email from a Port Authority employee who worked in the Government and Community Relations department (the "GOCOR Employee"). The email stated:

> Wanted you both have [sic] a heads up--[the Fort Lee] Borough Administrator, called me regarding the increased volume and congestion of AM rush traffic throughout the Borough as a result of the GWB toll lanes adjustment that occurred.
>
> She mentioned that there were 2 incidents that Ft Lee PD and EMS had difficulty responding to; a missing child (later found) and a cardiac arrest.
>
> She stated additionally that the Borough and PD had no advance notice of the planned change. Also, Bill the Mayor [Sokolich] had placed calls to your office.
>
> If there is anything you need me to do, let me know. Thank you.

Despite receiving the GOCOR Employee's email, with its references to a missing child and a medical emergency, defendant BARONI and Wildstein refused to contact Mayor Sokolich or the Fort Lee Chief of Police about the safety concerns.

30.    In the afternoon of September 9, 2013, defendant KELLY checked to see if Mayor Sokolich was reaching out elsewhere. To that end, defendant KELLY sent an email to an IGA employee ("IGA Employee #1") asking, "Have you spoken to the Fort Lee Mayor?" IGA Employee #1 responded, "No, not in a while." Defendant KELLY also emailed the Campaign Employee, asking, "Have you heard from Sokolich in a while?" The Campaign Employee responded, "I haven't."

31.    Also on September 9, 2013, defendant KELLY and Wildstein had a telephone conversation during which Wildstein reported to defendant KELLY that the lane and toll booth reductions had caused traffic problems in Fort Lee. Defendant KELLY instructed Wildstein to continue the reductions the following day; defendant BARONI agreed with that instruction.

32.    On September 10, 2013, after the lane and toll booth reductions continued into a second day, defendant BARONI received and deliberately ignored two text messages from Mayor Sokolich. One message stated:

> Bill: Mark Sokolich here . . . Port Authority has reduced the toll Boots [*sic*] for Fort Lee from three to only one. As of yesterday we are in total gridlock. Same thing today. Have a town that is ready to revolt. Who's mad at me? What do I do when Redevelopment 5 is online. Would not otherwise bother you however I have no choice. Please call me. Rather urgent.

The other message from Mayor Sokolich stated: "Presently we have four [*sic*] very busy traffic lanes merging into only one toll booth . . . . . The bigger problem is getting kids to school. Help please. It's maddening." Later that day, defendant BARONI forwarded the second text message to Wildstein; Wildstein, in turn, forwarded that message to defendant KELLY.

33.    After Wildstein received and forwarded to defendant KELLY Mayor Sokolich's text message about the problem of getting children to school, defendant KELLY and Wildstein exchanged text messages that stated, in pertinent part:

| SOURCE | TEXT |
|---|---|
| KELLY CELL | "Is it wrong that I am smiling?" |
| WILDSTEIN CELL | "No" |
| KELLY CELL | "I feel badly about the kids" |
| KELLY CELL | "I guess" |
| WILDSTEIN CELL | "They are the children of Buono voters . . . " |
| WILDSTEIN CELL | "Bottom line is he didn't say safety" |
| KELLY CELL | "Exactly!" |

Wildstein's statement about "Buono voters" was a reference to supporters of New Jersey State Senator Barbara Buono, Governor Christie's principal opponent in the 2013 gubernatorial election. Despite Mayor Sokolich's pleas for help and information and his reference to schoolchildren stuck in traffic gridlock, defendant BARONI did not respond to him.

34.    On September 10, 2013, defendant BARONI received two communications regarding Mayor Sokolich's attempts to seek information about the lane and toll booth reductions. The first was an email from defendant BARONI's assistant that read, in pertinent part: "Phone call: Mayor Sokolich (his office) . . . re: change of traffic patterns." The second was an email from the GOCOR Employee that stated, in pertinent part:

> Fort Lee Mayor Mark Sokolich called this morning regarding the traffic in Fort Lee[.]
>
> "reasons unclear to us . . ."
>
> The Mayor would like to talk to you as soon as possible, regarding the traffic congestion due to the change in GWB toll booths configuration. He remains concerned, doesn't understand the purpose/need of the traffic test and doesn't understand why the borough was not alerted. Additionally, he said that he is trying to "keep a lid on this" (politically) and is getting pressure from members of Borough Council who want to take some action. He feels this is a "life /safety" issue.

15

Defendant BARONI ignored and refused to respond to Mayor Sokolich's entreaties. Nor did defendant BARONI even inquire of Mayor Sokolich or the Fort Lee Chief of Police about the nature of the "life/safety" issue.

35.     Also on September 10, 2013, defendant KELLY and Wildstein had a telephone conversation during which Wildstein confirmed that the lane and toll booth reductions had caused traffic problems in Fort Lee. Defendant KELLY instructed Wildstein to continue the reductions the following day; defendant BARONI agreed with that instruction.

36.     On September 11, 2013, defendant KELLY and Wildstein had a telephone conversation during which Wildstein reported to defendant KELLY that the lane and toll booth reductions again had caused traffic problems in Fort Lee. Defendant KELLY instructed Wildstein to continue the reductions the following day; defendant BARONI agreed with that instruction.

37.     On September 12, 2013, defendant BARONI received by email a letter from Mayor Sokolich that was marked "PERSONAL":

> I am writing this correspondence to you and am refraining from copying any other party in the hopes that a recent . . . decision by the Port Authority will be reversed quietly, uneventfully and without political fanfare.
>
> Permit me to elaborate. Without any notice whatsoever to Fort Lee (or any of its agencies, including our Police Department), the Port Authority reduced the available toll booths for traffic flowing through Fort Lee from three to one. Suffice it to say, this decision has wreaked havoc upon our community during the morning rush hour, visiting upon us complete gridlock. Having received absolutely no notice of this decision, not having obtained any response to our multiple inquiries concerning same, and try as we may to understand its rationale without the benefit of a response from the Port Authority, we are reaching the conclusion that there are punitive overtones associated with this initiative. What other conclusion could we possibly reach?

> Our emergency service vehicles are experiencing tremendous response time delays and my office is overwhelmed with complaints. <u>Unquestionably, this decision has negatively impacted public safety here in Fort Lee.</u> Adding insult to injury, many members of the public have indicated to me that the Port Authority Police Officers are advising commuters in response to their complaints that this recent traffic debacle is the result of a decision that I, as the Mayor, recently made. The basis, reason, or genesis of the decision is of no consequence to me; however, its profound and adverse impact on our community is of paramount importance to me.
>
> I have incessantly attempted to contact Port Authority representatives to no avail. Would you please be good enough to please have someone contact me or [the Fort Lee Chief of Police] to discuss the basis of this recent policy change and what we must do to reverse it . . . plain and simple. *Query:* What do I do when our billion dollar redevelopment is put on line at the end of the next year?
>
> Please call me as soon as possible in the hopes that we can resolve this issue and reverse a policy change that is wreaking havoc on Fort Lee . . . . the otherwise cooperative and supportive host community to the busiest bridge in the world.

(emphasis in original). Shortly after receiving Mayor Sokolich's letter, defendant BARONI forwarded it by email to Wildstein, who then forwarded it to defendant KELLY. As defendant BARONI, defendant KELLY, and Wildstein had agreed, defendant BARONI deliberately ignored and refused to respond to Mayor Sokolich's letter, despite its explicit reference to issues of public safety and "complete gridlock."

38.    In addition to the letter, on September 12, 2013, Mayor Sokolich called the GOCOR Employee regarding the lane and toll booth reductions. The GOCOR Employee then sent a message for defendant BARONI asking whether to return Mayor Sokolich's call. Defendant BARONI conveyed to the GOCOR Employee through coded language that the GOCOR Employee should not contact Mayor Sokolich.

39.    On September 12, 2013, defendant BARONI also received a text message from Mayor Sokolich that stated, "My frustration is now trying to figure out who is mad at me." Defendant BARONI refused to respond and instead forwarded this text message to Wildstein.

40.    Also on September 12, 2013, in response to a media inquiry about the lane and toll booth reductions and the resulting traffic congestion in Fort Lee, Wildstein, with defendant BARONI's knowledge and approval, caused the Port Authority's Media Relations department ("Media Relations") to issue a media statement that falsely claimed that: (A) "The Port Authority is reviewing traffic safety patterns at the George Washington Bridge to ensure proper placement of toll lanes"; and (B) the "PAPD has been in contact with Fort Lee throughout the transition." Wildstein sent a draft of this statement to defendant KELLY before it was issued. Defendant BARONI, defendant KELLY, and Wildstein knew that this statement was not true.

41.    That same day, defendant KELLY received an email from an IGA employee ("IGA Employee #2") who summarized a telephone call that IGA Employee #1 had received from Mayor Sokolich. The email stated:

> This afternoon, [IGA Employee #1] received a call from Mayor Sokolich. It came from a number he was not familiar with that was actually a secretary who patched the Mayor through to [IGA Employee #1].
>
> The Mayor is extremely upset about the reduction of toll lanes from 3 to 1. Not only is is [sic] causing a horrendous traffic back up in town, First Responders are having a terrible time maneuvering the traffic because the back up is so severe.
>
> The Mayor told [IGA Employee #1] that he has no idea why Port Authority decided to do this, but there is a feeling in town that it is government retribution for something. He simply can't understand why that would be the case however, because he has always been so supportive of the Governor.
>
> Sokolich explained that the Council wants to organize a press conference with picketers at the foot of the bridge. The Mayor

> feels he is about to lose control of the situation and that he looks like a "f[***]ing idiot."
>
> [IGA Employee #1] told the fine Mayor he was unaware that the toll lanes were closed, but he would see what he could find out.

Defendant KELLY forwarded IGA Employee #2's email to Wildstein. As defendant BARONI, defendant KELLY, and Wildstein had agreed, despite receiving the email from IGA Employee #2 and its references to "horrendous traffic back up" and the problems facing first responders, defendant KELLY did not contact Mayor Sokolich, or take any steps to address his concerns. Instead, defendant KELLY responded to IGA Employee #2's email conveying that Mayor Sokolich was upset: "Good."

42.     On the morning of September 13, 2013, defendant BARONI, among others, received an email from the Executive Director announcing that he had learned about and was ending the lane and toll booth reductions. The Executive Director explained that he was doing so because, among other reasons: (A) the lane and toll booth reductions had been implemented without notifying Fort Lee, the commuting public, Media Relations, or the Executive Director; and (B) the lane and toll booth reductions had engulfed the entire Fort Lee area in severe traffic delays and had resulted in delays to emergency vehicles.

43.     After sending this email, the Executive Director copied defendant BARONI on an email that he sent to the head of Media Relations, asking how the Port Authority could inform the public that the lane and toll booth reductions had ended. Defendant BARONI emailed the Executive Director that they "need[ed] to discuss prior to any communications" and that "[t]here can be no public discourse."

44.     Later that day, defendant BARONI met with the Executive Director on two occasions. Defendant BARONI demanded that the Executive Director immediately reinstate the

lane and toll booth reductions because the reductions were important to "Trenton." The Executive Director refused defendant BARONI's demand.

45.     Also on September 13, 2013, in response to a media inquiry about the lane and toll booth reductions and the resulting traffic in Fort Lee, defendant BARONI and Wildstein drafted, approved, and caused Media Relations to issue a second false and misleading media statement: "The Port Authority has conducted a week of study at the George Washington Bridge of traffic safety patterns. We will now review those results and determine the best traffic patterns at the GWB. We will continue to work with our local law enforcement partners."

46.     After the lane and toll booth reductions ended, defendant BARONI, defendant KELLY, and Wildstein continued their agreement to use Port Authority resources to advance their cover story. They also agreed that defendant BARONI would continue to respond with deliberate silence to Mayor Sokolich's requests for an explanation of the reductions.

47.     On September 16, 2013, in response to another media inquiry, defendant BARONI instructed Media Relations to re-issue the same false and misleading media statement that he and Wildstein had drafted and approved on Friday, September 13, 2013.

48.     On September 17, 2013, Mayor Sokolich sent the following text messages to defendant BARONI:

> We should talk. Someone needs to tell me that the recent traffic debacle was not punitive in nature. The last four reporters that contacted me suggest that the people they are speaking with absolutely believe it to be punishment. Try as I may to dispel these rumors I am having a tough time.
>
> A private face-to-face would be important to me. Perhaps someone can enlighten me as to the errors of my ways. Let me know if you'll give me 10 minutes. Regards Mark

49.     Defendant BARONI immediately forwarded Mayor Sokolich's text messages to Wildstein and noted that they were from "Serbia," referring to Mayor Sokolich (who is actually

of Croatian descent). Wildstein then forwarded them to defendant KELLY and sought instructions about how to respond. That same day, Wildstein exchanged multiple messages with defendant BARONI and defendant KELLY as they coordinated the response to Mayor Sokolich's texts. [Wildstein's communications with defendant BARONI are unshaded and Wildstein's communications with defendant KELLY are shaded in black]:

| SOURCE | RECIPIENT | TEXT |
|---|---|---|
| BARONI CELL | WILDSTEIN CELL | "Serbia???" |
| WILDSTEIN CELL | BARONI CELL | "Have not heard back fr Bridget" |
| BARONI CELL | WILDSTEIN CELL | "Fck" |
| WILDSTEIN CELL | KELLY CELL | "Please let me know instructions" |
| KELLY CELL | WILDSTEIN CELL | "Just finishing a meeting" |
| WILDSTEIN CELL | KELLY CELL | "Ok. I'm in board meeting but can step out to call when you're ready" |
| WILDSTEIN CELL | BARONI CELL | "Bridget; Just finishing a meeting" |
| WILDSTEIN CELL | BARONI CELL | "So we will speak soon" |
| BARONI CELL | WILDSTEIN CELL | "We could sched a meeting to stave off reporters then pull a faps" |
| WILDSTEIN CELL | BARONI CELL | "Like for Monday?" |
| BARONI CELL | WILDSTEIN CELL | "Too cute. Tuesday or later next week." |
| WILDSTEIN CELL | BARONI CELL | "Ok" |
| WILDSTEIN CELL | KELLY CELL | "Baroni crazed so let me know when to call, I have something at 3 I can't walk out of" |

"[P]ull a faps" referred to defendant BARONI's and Wildstein's strategy of scheduling a meeting that they intended all along to cancel, as they did with FAPS, Inc. ("FAPS"), a Port Authority tenant, to punish Mayor Fulop, who had represented FAPS.

50. On September 17, 2013, defendant BARONI caused his assistant to schedule a meeting with Mayor Sokolich, although defendant BARONI intended to cancel. Before defendant BARONI could cancel the meeting, however, Mayor Sokolich did so.

51. After the lane and toll booth reductions ended, defendant BARONI and Wildstein discussed obtaining Port Authority traffic data to assist them in further developing the fiction that the reductions had been for a traffic study. On September 24, 2013, pursuant to that discussion, Wildstein obtained Port Authority traffic data from a Port Authority employee.

52. In or about November 2013, with defendant KELLY's knowledge, defendant BARONI and Wildstein prepared a misleading written statement for a Port Authority report that would falsely represent that the reductions were for a traffic study. To prepare that written statement, defendant BARONI and Wildstein improperly used Port Authority resources, including the time and services of Port Authority personnel.

53. On November 20, 2013, defendant BARONI was invited to testify on November 25, 2013 before the Assembly Transportation Committee, which was investigating the lane and toll booth reductions. As a result, with defendant KELLY's knowledge, defendant BARONI and Wildstein converted the draft of the false and misleading written statement into defendant BARONI's prepared opening testimony.

54. On November 22, 2013, while preparing for his upcoming testimony, defendant BARONI had conversations with two PAPD officers, during which defendant BARONI sought to enlist their assistance in falsely corroborating that the PAPD had suggested a traffic study of the Local Access Lanes. Both PAPD officers told defendant BARONI that the PAPD had had no such involvement.

55. On November 25, 2013, defendant BARONI appeared before the Assembly Transportation Committee and, with the knowledge and agreement of defendant KELLY and

Wildstein, provided false and misleading testimony about the lane and toll booth reductions. During his testimony, defendant BARONI knowingly and intentionally made the following misleading statements and false representations, among others:

    A.    Communications between members of the PAPD and Wildstein triggered the lane and toll booth reductions.

    B.    The lane and toll booth reductions were part of a one-week traffic study.

    C.    The failure to communicate with Fort Lee and the Executive Director was simply the result of communication breakdowns at the Port Authority.

In particular, with respect to what he repeatedly insisted were communication breakdowns with Fort Lee, defendant BARONI did not admit that he intentionally maintained "radio silence" toward Mayor Sokolich, but instead testified falsely, "[t]he communication was flawed internally, the communication was flawed with our neighbors—no question. And I'm—given the amount of time I've spent building a relationship with Mark Sokolich—hugely problematic, personally."

56.    On November 25, 2013, defendant BARONI, defendant KELLY, and Wildstein caused public statements to be prepared by others in support of defendant BARONI's testimony before the Assembly Transportation Committee.

57.    On December 12, 2013, defendant KELLY telephoned IGA Employee #2 and discussed their September 12, 2013 email exchange, referred to above in Paragraph 41, in which IGA Employee #2 recounted IGA Employee #1's conversation with Mayor Sokolich about the traffic problems and to which defendant KELLY responded, "Good." During their conversation, defendant KELLY asked IGA Employee #2 to delete that email exchange.

58.    On December 13, 2013, the day on which the resignations of defendant BARONI and Wildstein from the Port Authority became effective, defendant KELLY falsely claimed that she had nothing to do with the lane and toll booth reductions.

<u>OVERT ACTS</u>

59.    In furtherance of the conspiracy and to effect its unlawful object, the following overt acts were committed in the District of New Jersey and elsewhere:

A.    On August 13, 2013, defendant KELLY sent Wildstein an email stating, "Time for some traffic problems in Fort Lee."

B.    On August 13, 2013, shortly after receiving defendant KELLY's email, Wildstein acknowledged his assent to defendant KELLY's instruction by responding, "Got it."

C.    Subsequently, on or about August 13, 2013, Wildstein informed defendant BARONI of defendant KELLY's instruction to cause traffic problems in Fort Lee, and defendant BARONI agreed that Wildstein should take steps to implement defendant KELLY's instruction.

D.    On or about August 28, 2013, Wildstein contacted the Engineer and falsely represented that Wildstein was planning to order the removal of the traffic cones that segregated the Main Line from the Local Approach to assess the traffic flow at the GWB upper level toll plaza.

E.    On September, 6, 2013, Wildstein had a telephone conversation with the GWB Manager during which: (1) he directed the GWB Manager to implement the lane and toll booth reductions starting on September 9, 2013 at 6:00 a.m., in time for the morning rush; (2) he falsely represented to the GWB Manager that these reductions were being implemented to conduct a traffic study; and (3) he directed the GWB Manager not to notify any Fort Lee officials about the impending reductions.

F.    On September 6, 2013, Wildstein had a telephone conversation with the TB&T Manager, during which: (1) he told the TB&T Manager that the lane and toll booth reductions would be implemented starting on the morning of September 9, 2013; and (2) he falsely represented to the TB&T Manager that these reductions were being implemented to conduct a traffic study.

G.    On September 6, 2013, Wildstein had a telephone conversation with the Engineer during which he told the Engineer that the lane and toll booth reductions would be implemented starting on the morning of September 9, 2013.

H.    On September 7, 2013, Wildstein sent defendant KELLY an email in which Wildstein stated that he would inform defendant KELLY on the morning of September 9, 2013 of the impact of the lane and toll booth reductions.

I.    On September 8, 2013, Wildstein forwarded to defendant BARONI an email from the GWB Manager describing Port Authority resources being used to implement the lane and toll booth reductions.

J.    On September 9, 2013, at approximately 6:00 a.m., defendant BARONI, defendant KELLY, and Wildstein caused the lane and toll booth reductions to become effective.

K.    On September 9, 2013, after receiving an email from defendant BARONI indicating that Mayor Sokolich had called defendant BARONI that morning "re: urgent matter of public safety in Fort Lee," Wildstein responded to defendant BARONI by sending an email that stated: "radio silence."

L.    On September 9, 2013, defendant KELLY sent Wildstein an email, thanking Wildstein for confirming that defendant BARONI maintained "[r]adio silence" toward Mayor Sokolich.

M.     On September 9, 2013, defendant KELLY emailed IGA Employee #1 to check whether IGA Employee #1 had spoken to Mayor Sokolich.

N.     On September 9, 2013, defendant KELLY emailed the Campaign Employee to ask whether the Campaign Employee had heard from Mayor Sokolich in a while.

O.     On September 9, 2013, defendant KELLY told Wildstein by telephone to continue the lane and toll booth reductions on September 10, 2013.

P.     On September 10, 2013, defendant KELLY told Wildstein by telephone to continue the lane and toll booth reductions on September 11, 2013.

Q.     On September 11, 2013, defendant KELLY told Wildstein by telephone to continue the lane and toll booth reductions on September 12, 2013.

R.     On September 12, 2013, defendant BARONI forwarded to Wildstein Mayor Sokolich's September 12, 2013 letter regarding the impact of the lane and toll booth reductions.

S.     On September 12, 2013, Wildstein forwarded to defendant KELLY Mayor Sokolich's September 12, 2013 letter regarding the impact of the lane and toll booth reductions.

T.     On September 12, 2013, defendant BARONI conveyed to the GOCOR Employee through coded language that the GOCOR Employee should not contact Mayor Sokolich.

U.     On September 12, 2013, defendant BARONI forwarded to Wildstein a text message from Mayor Sokolich that stated, "My frustration is now trying to figure out who is mad at me."

V.     On September 12, 2013, defendant BARONI and Wildstein drafted and approved a false and misleading media statement claiming that the lane and toll booth reductions were done to review traffic safety patterns at the GWB.

W.    On September 12, 2013, defendant KELLY forwarded to Wildstein an email from IGA Employee #2 regarding a telephone call from Mayor Sokolich to IGA Employee #1 about the traffic problems in Fort Lee.

X.    On September 12, 2013, defendant KELLY responded to IGA Employee #2's email about the telephone call from Mayor Sokolich to IGA Employee #1, stating, "Good."

Y.    On September 13, 2013, defendant BARONI told the Executive Director by email that they "need[ed] to discuss prior to any communications" and that "[t]here can be no public discourse."

Z.    On September 13, 2013, defendant BARONI demanded that the Executive Director reinstate the lane and toll booth reductions because the reductions were important to "Trenton."

AA.    On September 13, 2013, defendant BARONI and Wildstein drafted and approved a second false and misleading media statement claiming that the lane and toll booth reductions were done to conduct a week of study of traffic safety patterns at the GWB.

BB.    On September 16, 2013, defendant BARONI instructed Media Relations to re-issue the false and misleading media statement that he and Wildstein had drafted and approved on September 13, 2013.

CC.    On November 25, 2013, defendant BARONI provided false and misleading testimony regarding the lane and toll booth reductions to the Assembly Transportation Committee.

DD.    On December 12, 2013, defendant KELLY asked IGA Employee #2 to delete their September 12, 2013 email exchange regarding a telephone call from Mayor Sokolich, as referred to above in Paragraph 41.

In violation of Title 18, United States Code, Section 371.

## COUNT 2

### (Obtaining by Fraud, Knowingly Converting, and Intentionally Misapplying Property of an Organization Receiving Federal Benefits)

1.     Paragraph 1 and Paragraphs 3 to 59 of Count 1 are realleged and incorporated by reference as though fully set forth in this Count.

2.     From in or about August 2013 to in or about December 2013, in the District of New Jersey and elsewhere, defendants

WILLIAM E. BARONI, JR. and
BRIDGET ANNE KELLY,

with defendant BARONI and Wildstein being agents of the Port Authority, obtained by fraud, otherwise without authority knowingly converted to their use and the use of others, and intentionally misapplied property owned by and under the care, custody, and control of the Port Authority, with a value of at least $5,000.

In violation of Title 18, United States Code, Section 666(a)(1)(A) and Section 2.

## COUNT 3

### (Conspiracy to Commit Wire Fraud)

1.      Paragraph 1 and Paragraphs 3 to 59 of Count 1 are realleged and incorporated by reference as though fully set forth in this Count.

### THE CONSPIRACY

2.      From in or about August 2013 to in or about December 2013, in the District of New Jersey and elsewhere, defendants

WILLIAM E. BARONI, JR. and
BRIDGET ANNE KELLY

knowingly and intentionally conspired and agreed with each other and others, including Wildstein, to devise a scheme and artifice to defraud, and to obtain money and property from the Port Authority by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communications in interstate commerce certain writings, signs, signals, pictures, and sounds, contrary to Title 18, United States Code, Section 1343.

### THE OBJECT OF THE CONSPIRACY

3.      The object of the conspiracy was to obtain money and property from the Port Authority and to deprive the Port Authority of its right to control its own assets by falsely representing and causing false representations to be made that the lane and toll booth reductions were for the purpose of a traffic study.

### MANNER AND MEANS OF THE CONSPIRACY

4.      To carry out the conspiracy and to effect its unlawful object, defendant BARONI, defendant KELLY, and others, including Wildstein, engaged in a number of means and methods, including those referred to in Paragraphs 8 to 58 of Count 1, among others, and those described below.

5.      Throughout the course of the conspiracy and in furtherance of their fraudulent scheme, defendant BARONI, defendant KELLY, and Wildstein caused telephone calls to be made and received in interstate commerce and caused emails to be sent and received in interstate commerce.

In violation of Title 18, United States Code, Section 1349.

## COUNTS 4 to 7

### (Wire Fraud)

1.      Paragraph 1 and Paragraphs 3 to 59 of Count 1 and Paragraphs 3 to 5 of Count 3 are realleged and incorporated by reference as though fully set forth in Counts 4 to 7.

2.      From in or about August 2013 to in or about December 2013, in the District of New Jersey and elsewhere, defendants

WILLIAM E. BARONI, JR. and
BRIDGET ANNE KELLY

and others, including Wildstein, knowingly and intentionally devised and intended to devise a scheme and artifice to defraud the Port Authority and to obtain money and property from the Port Authority by means of materially false and fraudulent pretenses, representations, and promises, which scheme is described in substance above in Count 3 of the Indictment.

3.      On or about the dates set forth below, in the District of New Jersey and elsewhere, for the purpose of executing and attempting to execute this scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, the respective defendant knowingly and intentionally transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, pictures and sounds, as described below:

| COUNT | DATE | USE OF INTERSTATE WIRE | DEFENDANT |
|-------|------|------------------------|-----------|
| 4 | August 13, 2013 | Email from defendant KELLY to Wildstein stating, "Time for some traffic problems in Fort Lee" | KELLY |
| 5 | September 9, 2013 | Email from defendant BARONI to Wildstein indicating that Mayor Sokolich had called for defendant BARONI that morning "re: urgent matter of public safety in Fort Lee" | BARONI |
| 6 | September 9, 2013 | Email from defendant KELLY to Wildstein thanking Wildstein for confirming that defendant BARONI maintained "[r]adio silence" toward Mayor Sokolich | KELLY |
| 7 | September 12, 2013 | Email from defendant BARONI to Wildstein forwarding a letter that was marked "PERSONAL" from Mayor Sokolich to defendant BARONI, dated September 12, 2013 | BARONI |

In violation of Title 18, United States Code, Section 1343 and Section 2.

## COUNT 8

### (Conspiracy Against Civil Rights)

1.      Paragraph 1 and Paragraphs 3 to 59 of Count 1 and Paragraphs 3 to 5 of Count 3 are realleged and incorporated by reference as though fully set forth in this Count.

#### THE CONSPIRACY

2.      Between in or about August 2013 and on or about September 13, 2013, in the District of New Jersey and elsewhere, defendants

WILLIAM E. BARONI, JR. and
BRIDGET ANNE KELLY

knowingly and willfully conspired and agreed with each other and others, including Wildstein, to injure and oppress the residents of Fort Lee in the free exercise and enjoyment of the rights and privileges secured to them by the Constitution and laws of the United States, namely, the right to localized travel on public roadways free from restrictions unrelated to legitimate government objectives.

#### THE OBJECT OF THE CONSPIRACY

3.      The object of the conspiracy was to interfere with the localized travel rights of the residents of Fort Lee for the illegitimate purpose of causing significant traffic problems in Fort Lee to punish Mayor Sokolich.

#### MANNER AND MEANS OF THE CONSPIRACY

4.      To carry out the conspiracy and to effect its unlawful object, defendant BARONI, defendant KELLY, and others, including Wildstein, engaged in a number of means and methods, including those referred to in Paragraphs 8 to 58 of Count 1 and Paragraphs 4 and 5 of Count 3, among others, and those described below.

5.    Defendant BARONI, defendant KELLY, and Wildstein chose the first day of school in Fort Lee to implement the lane and toll booth reductions to maximize the impact of the reductions and create as much traffic and disruption as possible in Fort Lee.

6.    Defendant BARONI, defendant KELLY, and Wildstein purposely selected a strategy that merged traffic that ordinarily fed into the Three Southernmost Toll Booths into one lane leading to one toll booth that was designated for use by all vehicles whether the motorists paid the toll by cash or E-Z Pass.

7.    Defendant BARONI, defendant KELLY, and Wildstein agreed that no advance warning of the lane and toll booth reductions would be provided to the public so that motorists using the Local Approach and residents of Fort Lee could not anticipate delays, adjust their travel plans, or otherwise prepare for the anticipated disruption caused by the traffic.

8.    Defendant BARONI, defendant KELLY, and Wildstein agreed that, to exacerbate the impact of the reductions, no advance notice of the lane and toll booth reductions would be provided to Mayor Sokolich or the Fort Lee Chief of Police.

9.    To minimize the risk of detection and leaks, defendant BARONI, defendant KELLY, and Wildstein purposely gave short advance notice to Port Authority personnel on or about Friday, September 6, 2013 to implement the lane and toll booth reductions on Monday morning, September 9, 2013.

10.    Defendant BARONI, defendant KELLY, and Wildstein agreed that the Port Authority and IGA would maintain "radio silence" toward Mayor Sokolich, even when Mayor Sokolich advised on multiple occasions that the lane and toll booth reductions were adversely affecting Fort Lee and were posing increased risks to public safety.

11.     During the lane and toll booth reductions, despite receiving updates on the serious traffic congestion that they were inflicting upon Fort Lee and its residents, defendant BARONI, defendant KELLY, and Wildstein agreed that the reductions should continue each day.

In violation of Title 18, United States Code, Section 241.

## COUNT 9

### (Deprivation of Civil Rights)

1.      Paragraph 1 and Paragraphs 3 to 59 of Count 1, Paragraphs 3 to 5 of Count 3, and Paragraphs 3 to 11 of Count 8 are realleged and incorporated by reference as though fully set forth in this Count.

2.      Between in or about August 2013 and on or about September 13, 2013, defendant BARONI and Wildstein were agents of the Port Authority and defendant KELLY was an agent of the Governor's Office. During that time period, defendant BARONI, defendant KELLY, and Wildstein were acting under color of law within the meaning of Title 18, United States Code, Section 242.

3.      Between in or about August 2013 and on or about September 13, 2013, in the District of New Jersey and elsewhere, defendants

WILLIAM E. BARONI, JR. and
BRIDGET ANNE KELLY,

with defendant BARONI, defendant KELLY, and Wildstein acting under color of law, knowingly and willfully deprived the residents of Fort Lee of the rights, privileges, and immunities secured and protected by the Constitution and laws of the United States, namely, the right to localized travel on public roadways free from restrictions unrelated to legitimate government objectives.

In violation of Title 18, United States Code, Section 242 and Section 2.

**A TRUE BILL**

_____
PAUL J. FISHMAN
UNITED STATES ATTORNEY

CASE NUMBER: 15- 193 (SDW)

## United States District Court
## District of New Jersey

UNITED STATES OF AMERICA

v.

WILLIAM E. BARONI, JR. and
BRIDGET ANNE KELLY

# INDICTMENT

18 U.S.C. §§ 241, 242, 371,
666(a)(1)(A), 1343, 1349, and 2

## PAUL J. FISHMAN
UNITED STATES ATTORNEY, NEWARK, NEW JERSEY

LEE M. CORTES, JR.
VIKAS KHANNA
DAVID W. FEDER
ASSISTANT U.S. ATTORNEYS
NEWARK, NEW JERSEY
973-645-2742